## Jeffrey Billado, et al. v. Janis Appel, et al.

[687 A.2d 84]

No. 94-631

Present: **Gibson, Dooley and Johnson, JJ., and Burgess, D.J., Specially Assigned**[1]

Opinion Filed October 11, 1996

---

[1] Burgess, D.J., sat at oral argument but did not participate in the decision.

*Robert K. Andres*, Burlington, and *Gordon Nicholson* (On the Brief), Highgate Springs, for Plaintiffs-Appellants.

*Jeffrey L. Amestoy*, Attorney General, Montpelier, and *Michael O. Duane*, Assistant Attorney General, Waterbury, for Defendants-Appellees.

**Dooley, J.** Plaintiffs Jeffrey Billado and his minor children brought this tort and civil rights action against Vermont Department of Social and Rehabilitation Services (SRS) workers Janis Appel, Kelly Keefer Woodward, and Janet Dunigan, claiming that their actions with respect to the children caused plaintiffs' injuries. Summary judgment for defendants was granted by the Franklin Superior Court based on a finding that each was immune from suit with respect to the actions alleged. Plaintiffs have appealed this decision with respect to their civil rights claims, brought under 42 U.S.C. § 1983. We affirm.

The facts are derived from the complaint and the affidavits and documents submitted in connection with the motion for summary judgment. Most of the facts are undisputed.

Jeff and Melanie Billado were married on February 25, 1984. They had three children, Brandi, Courtney, and Jeffrey, Jr., between 1984 and 1987. The marriage was unstable, with recurring domestic violence, and the parties separated on many occasions for short periods of time. In August 1989, Melanie permanently moved out of Jeff's home to move in with her boyfriend, Joe Vincelette, taking the three children with her; she eventually went to Florida. In September, she reported to Florida authorities and to SRS that her husband had sexually abused the children.

Melanie's actions resulted in both parents filing abuse prevention petitions on September 7, 1989. At one point, temporary custody of the children was awarded to Melanie, and at another point it was awarded to Jeff. Jeff also filed for divorce. A hearing was held on September 27th, resulting in an order that "children are placed in the protective custody of SRS to determine proper placement." There is no indication that SRS was a party to the abuse prevention proceedings or sought this order. Apparently, SRS took custody of the children pursuant to the abuse prevention order.

Meanwhile defendant Woodward investigated the charge that Jeff had sexually abused the children, and after interviewing Melanie, Jeff and the children, concluded that the charge was substantiated with respect to Brandi. To the extent it can be determined from the documents, the conclusion is based primarily on a statement of Brandi. Woodward was also concerned about the presence of Vincelette in Melanie's home because earlier in the year he had been convicted of committing a lewd act on the body of a fourteen-year-old child who was residing temporarily with him. On Woodward's request and based on her affidavit, the Franklin County States Attorney brought a CHINS petition with respect to the children and sought and obtained an ex parte detention order on September 29, 1989, two days after the abuse prevention order. The children were placed in foster care.

In November 1989, the CHINS petition was dismissed, and another round of abuse prevention petitions was filed. These resulted in a final relief-from-abuse order, to last for one year, that provided in pertinent part: (1) Melanie was to have custody of the children; (2) Jeff was to be given visitation rights; (3) Melanie could not allow contact between the children and Joe Vincelette; and (4) both Melanie and Jeff were not to consume alcohol or regulated drugs. While this order was in effect, Jeff complained on several occasions to SRS that Melanie was allowing contact between the children and Vincelette and was consuming alcohol. An SRS worker, who is not a defendant in this action, wrote to the Franklin Family Court in February 1990 that she had observed Vincelette at Melanie's home. In March, Jeff brought a contempt motion and sought an order giving him custody of the children. Defendants Dunigan and Appel appeared in court with Melanie, and Melanie's lawyer argued that SRS supported the presence of Vincelette in the home.

Melanie's situation deteriorated, and on May 11, 1990 she was taken to a detox center for alcohol abuse. By June, it became clear that she could not continue to care for her children. At the contempt hearing, the court gave Melanie the option of giving SRS custody of the children or granting custody to Jeff. Melanie agreed to place the children in the custody of SRS under a voluntary care agreement. The children were placed by SRS with foster parents. The court order, issued June 5, 1990, allowed Jeff visitation at the foster home, prohibited contact between the children and Vincelette, and required Melanie to attend Alcoholics Anonymous meetings.

The court also ordered a family evaluation, and it was performed in July and August by Champlain Valley Psychiatric Services. Three

professionals interviewed all the persons in or involved with the family and conducted home studies. The report, filed at the end of August, disclosed that Melanie lived with Vincelette and that Brandi charged she had been sexually abused by Vincelette at some point in the past. The allegation of sexual abuse by Vincelette was communicated to SRS in July and investigated by Woodward. She interviewed Vincelette, Brandi, Courtney, Jeff, Melanie, the foster parents, Melanie's aunt, and the doctor who had heard the charge in her interview with Brandi. Woodward determined that the charge was not substantiated.

On learning in July that Vincelette was present when the children visited Melanie from the foster home, defendant Appel directed that all visitation by Melanie be supervised to ensure Vincelette was not present. Apparently, that direction was carried out.

Melanie provided defendant Appel a copy of the Champlain Valley Psychiatric Services report when it was issued. The June order was continued on August 31, with a direction that the voluntary care agreement continue to October 5th. Visitation for Melanie was provided "subject to the supervision and/or approval of SRS." Melanie again was ordered not to permit contact between Vincelette and the children.

On the expiration of the voluntary care agreement, with Melanie demanding that the children be returned to her, the Franklin County States Attorney filed another CHINS petition and obtained an emergency detention order to keep the children in foster care. The supporting affidavit from defendant Dunigan itemized the history, including the concern about the presence of Vincelette in Melanie's home, and sought continued SRS custody to prevent sole custody going to either parent. On October 29th, the petition was dismissed and the detention ended.

Dueling abuse prevention orders again ensued. Under one order, Jeff was given custody on October 29th. Four hours later a different judge issued another order giving custody to Melanie. On November 7, 1990, after hearing, the family court temporarily awarded custody to Melanie, with weekend visitation by Jeff, and again ordered no contact with Vincelette. In July 1991, the order was amended to grant custody to Jeff. The final divorce order, issued in December 1991, granted custody to Jeff.

On May 5, 1992, Jeff, on behalf of himself and the children as their next friend, brought this action against defendants Woodward, Appel and Dunigan. The complaint has forty-one counts and alleges defend-

ants committed torts and violated 42 U.S.C. § 1983, as discussed below. It was brought against defendants in their individual and official capacities. On motion of defendants, the court dismissed the § 1983 counts against defendants in their official capacities. That order has not been appealed. Other motions to dismiss were denied. On June 14, 1993, plaintiff filed an amended complaint that provided that most of the actions were taken by defendants along with the State of Vermont. The State was not named as a party. In January of 1994, defendants filed a motion for summary judgment primarily on the ground that defendants were immune from suit against the actions itemized in the complaint. The superior court granted the motion with respect to all counts on September 16, 1994. This appeal involves only the counts alleging that defendants violated the Civil Rights Act, 42 U.S.C. § 1983.

At the outset, we restate the familiar standard for review of a summary judgment decision. Summary judgment should be granted when, taking all allegations by the nonmoving party as true, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Madden v. Omega Optical, Inc.*, 165 Vt. 306, 309, 683 A.2d 386, 389 (1996). This Court applies the same standard as the trial court. *Id.* As discussed below, the issue before us is one of law, and none of the parties contend that it was inappropriate to resolve it on summary judgment.

Plaintiffs' position is that, absent immunity, their allegations made out a case for liability under § 1983; that absolute immunity does not apply; and that the elements of qualified immunity are not present. Plaintiffs also argue that they should have been allowed to engage in discovery before responding to the motion for summary judgment. Defendants contest whether plaintiffs' allegations would, if proven, establish liability under § 1983; argue that absolute immunity applies to some of defendants' alleged actions; and further argue that if qualified immunity applies, it covers all of defendants' alleged actions. As they did below, defendants resist any discovery before the immunity issue is decided.

■ A brief review of immunity law in § 1983 cases is helpful to put these arguments in context, before we address the specific allegations of plaintiffs' complaint. Immunity is a defense to § 1983 actions for damages against persons in their individual capacity. Those acting in a legislative, judicial or prosecutorial capacity are absolutely immune, irrespective of whether they act in good faith. See generally 2 S. Nahmod, Civil Rights and Civil Liberties Litigation

§ 7.01 (3d ed. 1991). Other public officials and employees have qualified immunity that protects them if they act in good faith. Under the objective test of good faith adopted by the Supreme Court, government officials performing discretionary functions are immune "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Defendants assert that some of the actions alleged to have violated plaintiffs' rights are prosecutorial or judicial in nature and absolute immunity applies to those actions. There is a split of authority on whether child welfare workers perform functions akin to prosecutors and on the larger question of whether the protection of children against abuse is so important that absolute immunity is required for those who do it. Compare *Robison v. Via*, 821 F.2d 913, 918-20 (2d Cir. 1987) (official conducting child abuse investigation and removing child from parents is protected only by qualified immunity) with *Meyers v. Contra Costa County Dep't of Social Servs.*, 812 F.2d 1154, 1157 (9th Cir. 1987) (child protection worker who initiates and pursues child dependency proceeding is entitled to absolute immunity). Because we hold that qualified immunity is sufficient to cover defendants' actions, we decline to reach the question of whether absolute immunity should apply.

In order to determine whether defendants' conduct has violated a clearly established right of plaintiffs, we must know what that right is. Moreover, the definition of the right must be specific to the circumstances, and "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In order to complete this analytical step, a number of courts have required civil rights plaintiffs to plead with particularity the constitutional right alleged to have been violated. See *Frazier v. Bailey*, 957 F.2d 920, 929 (1st Cir. 1992); *Stem v. Ahearn*, 908 F.2d 1, 6 (5th Cir. 1990).

Although we have attempted to discern what rights plaintiffs believe were violated, we emphasize that the complaint here fails all but the most liberal of pleading tests. The complaint allegations involving § 1983 stated as follows for each defendant:

> During the period from . . . until . . ., defendant [. . .]'s conduct deprived Plaintiffs directly and indirectly, of equal protection under the law and due process under the laws and

for the purpose of preventing and hindering Plaintiff's constitutional rights in violation of 42 U.S.C. Section 1983.

The wrongful actions of defendant . . . were made under color of the statutes, ordinances, regulations, customs and usages of the State of Vermont and has subjected the Plaintiffs to the deprivation of rights, privileges and immunities secured by the Constitution and Laws of the United States of America, including but not limited to the First, Fourth, Fifth, Ninth, Tenth and Fourteenth Amendments to the United States Constitution, all contrary to 42 U.S.C. Section 1983.

These counts incorporate by reference all the other counts of a long, scattergun complaint, apparently on the theory that we will figure out how and when defendants' tortious conduct is also unconstitutional.[2]

Ordinarily, we might require plaintiffs to specify their specific constitutional theories, and how they were so clearly established that defendants must be charged with knowledge of them, but six years have already elapsed since many of the events occurred, and finality is important. We also doubt that much specificity can or will be provided. Thus, we are left with muddling through a long, free-swinging and vague complaint to understand, as best we can, what constitutional rights might be involved and whether defendants should have been aware of these rights. We do not find this process an adequate substitute for informed, skilled and vigorous legal advocacy.

The complaint, and the legal rights involved, can best be analyzed by grouping counts by the nature of the asserted wrongs.

## I.

### Defendants Accuse Jeffrey Billado of Sexually Abusing Brandi

■ In counts I through III, plaintiff Jeffrey Billado complains that defendant Woodward failed to conduct a reasonable investigation of the allegation that he had sexually abused his children, reported that he had sexually abused and physically abused his children and ignored all evidence to the contrary. In counts XXII through XXIV,

---

[2]Defendants argue that we should consider only counts XXXV through XXXVII because these are the only counts that are denominated as having been brought pursuant to § 1983. These are the counts in the form set out in the text. These counts have no meaning unless they are taken as having included the allegations in the earlier counts.

plaintiff alleges that defendant Dunigan filed a petition with the Franklin Family Court alleging he abused his daughter Brandi and his son Jeffrey, even though she knew that the allegations had "previously been adjudicated unfavorably to SRS." Thus, she "knew that her affidavit and the requested petition was without merit." Apparently, plaintiffs allege that defendants' actions interfere with their constitutional right of family integrity.

Numerous courts have considered Civil Rights Act claims arising out of actions by state and local child welfare workers in investigating bona fide complaints of child abuse, particularly child sexual abuse, and moving through proper court proceedings to protect children, often by taking custody of them to prevent further abuse. Almost without exception, courts have found such actions to be protected by qualified immunity because there is no controlling constitutional right of family integrity or because the right is so amorphous and conditional that no worker could know that his or her actions were in violation of the right. See *Doe v. Louisiana*, 2 F.3d 1412, 1416-18 (5th Cir. 1993); *Frazier v. Bailey*, 957 F.2d at 931; *Van Emrik v. Chemung County Dep't of Social Servs.*, 911 F.2d 863, 866 (2d Cir. 1990); *Baker v. Racansky*, 887 F.2d 183, 187-90 (9th Cir. 1989); *Lux v. Hansen*, 886 F.2d 1064, 1067 (8th Cir. 1989); *Hodorowski v. Ray*, 844 F.2d 1210, 1217 (5th Cir. 1988). We adopted a similar rule of qualified immunity from state tort claims in *Murray v. White*, 155 Vt. 621, 632, 587 A.2d 975, 981 (1991) (law surrounding child sexual abuse investigations is not "so clearly established that defendant reasonably should have known that her acts violated plaintiff's rights"). We agree with the analysis from the above federal cases.

Plaintiffs attempt to distinguish this case, in part, by arguing that defendants violated certain SRS regulations governing the processing of child abuse complaints. For purposes of Civil Rights Act liability, this is a distinction without a relevant difference. The Act enforces federal law, not state law. Violations of state laws or regulations do not state a claim under § 1983. See *Ebmeier v. Stump*, 70 F.3d 1012, 1013 (8th Cir. 1995) ("Section 1983 guards and vindicates federal rights alone."); *Doe v. Connecticut Dep't of Child & Youth Servs.*, 911 F.2d 868, 869 (2d Cir. 1990) (allegation that defendant social worker violated state law in conducting child abuse investigation "is irrelevant").

To the extent that plaintiffs allege that defendants had improper motives in investigating the allegations that Jeff abused his children and reporting the findings, the summary judgment record does not

support these allegations. On receiving the complaint of abuse from Melanie, Woodward interviewed all the relevant persons, including the children. Brandi said her father sexually abused her, and Jeffrey, Jr. said his father physically abused him. Woodward was free to believe these statements over Jeff's denials. Plaintiffs have no constitutional right to ensure that defendant correctly exercises her discretion at all times. See *Napolitano v. Flynn*, 949 F.2d 617, 623 (2d Cir. 1991).

The allegations against Dunigan apparently relate to her affidavit in support of an emergency detention order in October 1990 after the voluntary care agreement had expired. That affidavit reports the results of Woodward's 1989 interviews and that the report that Jeff had sexually abused Brandi had been substantiated by SRS. Contrary to the complaint allegation, there never had been an adjudication that Jeff had not sexually abused Brandi, and there was no reason not to report that history in support of the request to retain the children in foster care rather than returning them to the custody of either parent.

## II.

### Defendants Encouraged Contact Between Vincelette and the Children
### As a Result, Vincelette Sexually Abused Brandi

In counts IV through VI, plaintiff Jeffrey Billado complains that defendant Woodward failed to investigate and report sexual abuse of his minor children by Joseph Vincelette. In counts VII through IX, plaintiff Brandi Billado, through Jeffrey Billado, complains that defendant Woodward failed to investigate her complaint of sexual abuse by Vincelette. Counts X through XXI are based on the allegation that defendant Appel encouraged Melanie Billado to reside with Joseph Vincelette and allowed contact between him and the children. This contact is alleged to have resulted in extreme mental anguish and acute mental distress for Jeffrey, Jeffrey, Jr., and Courtney Billado. With respect to Brandi Billado, the complaint alleges that Vincelette sexually abused her as a direct result of defendants' conduct.

These counts share with those above the allegation that the investigation of a sexual abuse complaint was inadequate, although with a different result. Here, the result was lack of substantiation of abuse, whereas the result with respect to Jeffrey was allegedly an

improper accusation of sexual abuse. To the extent the asserted wrong was failure to investigate properly a report of sexual abuse, we conclude that qualified immunity protected defendant Woodward's actions. Plaintiffs had no constitutional right to a proper investigation or any right involved was so amorphous or conditional that defendant could not have known that her actions were in violation of plaintiffs' constitutional right. In reaching this conclusion, we emphasize that there is no allegation that, as a result of Woodward's failure to investigate properly, Brandi was a victim of continuing sexual abuse.

Plaintiffs argue for the first time in this Court that although Woodward may be immune from damages on a family integrity theory, she is not immune from a claim that she denied plaintiffs access to the juvenile court, in violation of their due process rights.[3] This claim is based on the decision of the Fifth Circuit Court of Appeals in *Chrissy F. v. Mississippi Department of Public Welfare*, 925 F.2d 844 (5th Cir. 1991). Because this theory is more clearly raised with respect to defendant Appel, we consider it below.

The remainder of the allegations in these counts charge that defendant Appel failed to protect the children, and Brandi in particular, by allowing and encouraging contact between them and a known sexual abuser. Defendant argues that pursuant to the decision of the United States Supreme Court in *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), her actions were protected by qualified immunity because there was no clear constitutional right to the protection plaintiffs allege was absent.

*DeShaney* involved a failure of county social workers to investigate and take action on continuous reports that a father physically abused his four-year-old child. In the last incident, the father beat the child so severely that the child fell into a life-threatening coma and suffered severe brain damage. The child sued the workers claiming they had a constitutional duty to render assistance.

The Supreme Court dismissed the suit holding that a state's failure to protect an individual against private violence does not violate the due process clause of the Fourteenth Amendment. *Id.* at 197. The Court further held that the general rule was not modified by the State's knowledge of the individual's circumstances or by expressions of intent to help. *Id.* at 200. For example, the Court held that the fact

---

[3] Defendants argue that this claim should not be considered because it was not raised below. We agree that plaintiffs did not itemize the claim below, but it falls within their general allegation that they were denied due process of law. We have exercised our discretion to consider the claim.

that the State once took temporary custody of the plaintiff, in response to an earlier report of abuse, does not impose constitutional liability on the State or its workers after they returned the child to the father. *Id.* at 201.

The Court distinguished situations where the State has created or assumed a special relationship with the injured individual. Such circumstances arise only where "the State takes a person into its custody and holds him there against his will," because the State has rendered the person unable to care for himself. *Id.* at 199-200.

Although defendant Appel argues that *DeShaney* holds that no constitutional right is violated by her alleged conduct, the real issue before us is whether defendant is charged with violating a clearly established constitutional right of which a reasonable person would have notice. *DeShaney* was decided February 22, 1989, shortly before Melanie moved out of her home with Jeff, which triggered the action and inaction on which the complaint is based. Unless a later controlling precedent created the clearly established constitutional right we must find to overcome qualified immunity, we must use the *DeShaney* standard. We find no such later controlling precedent in the short period between *DeShaney* and defendant's acts.

In applying *DeShaney*, we have looked carefully at plaintiffs' allegations. Although the complaint broadly charges that between September 1989 and June 1991 defendant encouraged and allowed contact between Vincelette and the children and this conduct led to Vincelette's sexual abuse of Brandi, the allegations are narrowed in plaintiffs' arguments to this Court. Plaintiffs' arguments make clear that the alleged abuse, reports of abuse, and encouragement of contact occurred when SRS did not have custody of the children between November 1989 and June 1990. Thus, plaintiffs describe the claim in their brief:

> The Defendants had custody, then returned the children to their mother, at a time [when] the mother was living with Mr. Vincelette, someone SRS knew to be an abuser. The Defendants later received reports of abuse by Mr. Billado and failed to remove the children.

Their argument, stressed repeatedly, is that defendants knew Melanie, and therefore the children, were living with Vincelette, the contact between Vincelette and the children was in direct violation of the abuse prevention order, defendants failed to enforce the abuse prevention order or inform the court of the violation, defendants

failed to protect the children from Vincelette, and the sexual abuse of Brandi resulted. There is no statement in the complaint, or any of the papers submitted to this Court or the superior court, that the children were in SRS custody when the abuse by Vincelette allegedly occurred.

This factual narrowing is important because a number of post-*DeShaney* decisions have found clearly established constitutional rights to be involved where children in the custody of a state or local social services agency are abused, particularly if the abuse is perpetrated by foster parents. See *Norfleet v. Arkansas Dep't of Human Servs.*, 989 F.2d 289, 292-93 (8th Cir. 1993); *Yvonne L. v. New Mexico Dep't of Human Servs.*, 959 F.2d 883, 893 (10th Cir. 1992); *K.H. v. Morgan*, 914 F.2d 846, 853-54 (7th Cir. 1990). But see *Camp v. Gregory*, 67 F.3d 1286, 1298 (7th Cir. 1995) (although state child protection agency was guardian of juvenile, child protection worker was entitled to qualified immunity when juvenile was killed because juvenile was placed with a relative and theory of liability was inadequate supervision and intervention, not abuse by caretaker). This is not such a case.

We see no significant difference between this case and *DeShaney* such that a clearly established constitutional right was involved here. Relying primarily on pre-*DeShaney* cases, plaintiffs argue that there was a special relationship between SRS and the children based on the fact that SRS did have custody during the fall of 1989. The Court specifically rejected such a special relationship theory in *DeShaney* on similar facts, involving prior social services intervention and some monitoring of the family situation.

Nor do we find the situation different because of the outstanding abuse prevention order prohibiting contact between Vincelette and the children. The order was issued in a private proceeding between Melanie and Jeff, and SRS workers have no obligation to enforce the terms of that private order. To the extent there is a public responsibility to enforce such orders, it lies by statute with prosecutors and law enforcement officers, including state and local police and sheriffs. See 13 V.S.A. § 1030 (commission of act prohibited by abuse prevention order is a crime); 15 V.S.A. §§ 1107, 1108. Defendant is not a prosecutor or law enforcement officer.

As noted above, plaintiffs rely on a new theory of liability in this Court: that defendant Appel prevented plaintiffs' access to the juvenile court by failing to act on their abuse complaints in violation of their right to due process of law. They find this theory in *Chrissy*

*F. v. Mississippi Department of Public Welfare*, 925 F.2d at 852, where the court concluded that qualified immunity did not cover the actions of defendant social workers. We agree that, broadly read, the initial decision in *Chrissy F.* appears to accept plaintiffs' theory and hold that the constitutional right involved — i.e., access to the courts — is so clearly accepted that qualified immunity does not apply. The court held that the defendants' alleged actions of failing to investigate the plaintiff child's complaints of abuse and reporting them to the Mississippi Youth Court, as required by Mississippi statute, made out a constitutional claim of violation of meaningful access to the court. 925 F.2d at 851. The court further held that the right was clearly established, and qualified immunity did not apply. *Id.* at 852. Plaintiffs argue that *Chrissy F.* means that whenever child protection workers fail to do an adequate investigation of an abuse claim and, as a result, fail to file a CHINS petition to protect the child, they are liable for violating the child's right of access to the juvenile court and any resulting damages.

This broad reading of *Chrissy F.* is belied by later actions in the same case. On remand, the District Court held against the plaintiff on the access theory, with the following analysis:

> Consistent with [the *DeShaney*] . . . reading of the due process clause, the Court concludes that state actors have no general duty to affirmatively aid individuals in securing their fundamental right of access to courts. While a state certainly may not act to impede an individuals [sic] exercise of this fundamental right, this Court can find no precedent in right of access cases or in due process analysis generally which suggests that state actors must affirmatively act to secure an individual's rights as guaranteed under the fourteenth amendment. Accordingly, the Court concludes that, as to those claims asserting a deprivation of the right of access to courts based upon the failure of certain of the Defendants to take affirmative action on behalf of Chrissy, Plaintiff has failed to establish a right of recovery on that basis.

*Chrissy F. v. Mississippi Dep't of Pub. Welfare*, 780 F. Supp. 1104, 1125 (S.D. Miss. 1991). This holding was affirmed on appeal by the Fifth Circuit Court of Appeals. *Chrissy F. v. Mississippi Dep't of Pub. Welfare*, 995 F.2d 595, 600 (5th Cir. 1993).

We need not decide whether we would follow *Chrissy F.*[4] The only violation of access to the courts plaintiffs allege is the failure to bring a CHINS petition to separate Vincelette from the children. Plaintiffs have no constitutional right to insist that defendants intervene and provide that access by filing a CHINS petition.

## III.

### Defendants Seized the Children

Counts XXV through XXVII accuse defendant Dunigan of abusing her authority as an SRS worker to prevent plaintiff Jeffrey Billado from obtaining custody of his children. The time period alleged is June 1990 through November 1991. Counts XXVIII through XXX add that in that period defendant Dunigan "arrested, seized and took into custody the minor children . . . ." Counts XXXII through XXXIV state that in November 1991 defendants Dunigan and Appel seized the minor children, who are plaintiffs on these claims, and falsely imprisoned them.

The allegations of the complaint are difficult to reconcile with the undisputed facts.[5] We infer that all these counts relate to the actions that occurred on October 29, 1990, after the second CHINS petition was dismissed. Plaintiffs' version of the events of that day are contained in an affidavit of Jeffrey Billado submitted in response to defendants' motion for summary judgment:

---

[4] We note that there are significant differences between the posture of this case and *Chrissy F.*, as well as differences in the governing state law. Under Vermont law, CHINS petitions must be initiated by the state's attorney, and a number of different agencies can refer the case to the state's attorney. See 33 V.S.A. § 5517(a). Moreover, if SRS fails to act, "any person who has knowledge of the facts alleged" can refer the matter to the state's attorney, who is required to act on it. *Id.* There is no indication that plaintiffs ever went to the state's attorney.

Plaintiffs in this case were already in the family court, and had an order that provided for the relief they requested. As they eventually did, they could request the family court to enforce the order by contempt, if necessary. Thus, it is difficult to see how any action or inaction of defendants deprived them of access to the courts.

[5] For example, we can find no reference in the record to any significant event that occurred in November 1991, and defendants' affidavits indicate that they had no involvement in the case at that time. We assume that the date in the complaint is a mistake, and the acts were alleged to have occurred in October 1990. Even this assumption does not clear up the mystery. The complaint alleges the children were seized by defendants Dunigan and Appel. The affidavit of Jeffrey Billado states that defendants Woodward and Dunigan placed the children and Melanie in their car and drove to the state police barracks. All defendants deny driving Melanie and the children to the state police barracks.

> In September 1990 the protection service order was concluded. I obtained a relief from abuse order again granting me custody to the children. I went to the foster home with a sheriff. The foster parents informed us that Melanie and the SRS worker had already picked up the children.
>
> We found Melanie's trailer in St. Albans and when the sheriff was serving Melanie with the relief from abuse order, Melanie told the sheriff she wasn't going to let me take my children and that she was calling SRS. A short time later Janet Dunigan and Kelly [Woodward] arrived.
>
> . . . .
>
> Janet Dunigan and Kelly [Woodward] put the kids and Melanie in their car and drove to the State Police Barracks. The sheriff drove me to the State Police Barracks where I was served with a temporary relief from abuse order giving Melanie custody of the children.

Not surprisingly, defendants' versions are quite different. Defendant Woodward, in her affidavit, denies having any involvement in the events of October 29th. Defendant Dunigan, in her affidavit, states that (1) she accompanied Melanie to the foster home on October 29th and drove Melanie and the children to Melanie's home, (2) she saw no sheriff or law enforcement officer at Melanie's home, and (3) she left Melanie's home and thereafter was called to the state police barracks where Melanie and the children were present with an advocate to prepare a relief-from-abuse petition. An affidavit of Melanie supports the statements of Dunigan and Woodward.

It is not our place to resolve the factual disputes on summary judgment. However, plaintiffs' arguments have not clarified what constitutional rights are alleged to have been violated by defendants' actions. At most, plaintiffs have alleged that defendants improperly aided Melanie to defeat one abuse prevention order and obtain an inconsistent order in her favor, all subject to a full hearing the next day to resolve the custody dispute. We cannot see how the facts, even as alleged by plaintiffs, make out an "arrest" or "seizure" of the children since they were at all times in the custody of Melanie.

Even where child protection workers have intervened to take temporary custody of children without court order, most courts have held that their actions are protected by qualified immunity. We find this case closer to *Stem v. Ahearn*, 908 F.2d 1 (5th Cir. 1990), where

child protection workers investigated a mother's allegation that the father had sexually abused their minor children, found that such abuse had occurred, and helped the mother obtain custody in a proceeding between the parents. In holding that the workers' actions violated no clearly established rights of the father, the court reasoned:

> [Plaintiff] ignores the fact that his parental rights were impinged only after a judicial hearing at which he was fully heard. [The workers] never physically removed [plaintiff's] child from him or otherwise altered his parental rights under the law, although [one worker] did testify in court concerning his investigatory conclusions and did advise the mother to keep the daughter away from the plaintiff. However, offering adverse judicial testimony at a child-custody hearing does not implicate due process concerns and, further, it constitutes witness testimony that is absolutely immune from section 1983 liability.

*Id.* at 6. Even under plaintiffs' version of the facts, defendants' actions were similar to those in *Stem*. Having concluded that Jeffrey Billado had sexually abused Brandi, and Vincelette had not, defendants aided Melanie in retaining custody through an abuse prevention order issued by a family court judge. The purpose and effect was to bring the matter before the family court for a contested hearing, which occurred the next day. We see no clearly established constitutional right that was violated by defendants' actions.

## IV.

### *Defendant Invaded Plaintiffs' Privacy by Using a Private Family Evaluation*

Count XXXI alleges that defendant Dunigan violated plaintiffs' right to privacy by obtaining and disseminating the private evaluation prepared by Champlain Valley Psychiatric Services although she had been denied access to the report by Jeffrey Billado. Jeff's affidavit stated that defendant asked him for a copy of the report and a release and he refused. Thereafter, defendant used information from the report in her affidavit in support of the 1990 CHINS petition. The affidavit contained misrepresentations about the report.

Defendant's affidavit in support of summary judgment indicates she obtained the report from Melanie, and this is supported by Melanie's affidavit. Defendant's affidavit that accompanied the

CHINS petition noted the completion of the report and itemized Melanie's deficiencies, emphasizing the "great concern" of the report authors that Melanie disregarded the requirement prohibiting contact between the children and Vincelette and intended to continue to disregard it. The affidavit stated that SRS was continuing to investigate a charge that Vincelette had sexually assaulted Brandi. With respect to Jeff, it said that the report found "a psychological profile of a somewhat suspicious and guarded individual who can be overly hostile, resentful and argumentative, and tends to project blame onto others for his personal problems." It concluded that the report authors "had reservations about both parents in regard to sole custody of the children."

Apparently, plaintiffs rely on some amorphous constitutional right to privacy as the basis for their § 1983 claim. They have failed to define it in any of their filings, and we find it too general to allow realistic analysis. See *Hodge v. Jones*, 31 F.3d 157, 167 (4th Cir. 1994). Moreover, we fail to see why Melanie's release of the report, even if it was otherwise confidential and privileged, did not give defendant the right to rely on it in a confidential juvenile proceeding. Even if plaintiffs could make out a constitutional violation, defendant's actions were covered by qualified immunity.

## V.

### *Plaintiffs Were Denied Discovery*

With respect to all counts of their complaint, plaintiffs argue that they were improperly disadvantaged by the failure of the superior court to allow discovery before ruling on the summary judgment motion. Qualified immunity is an immunity from suit rather than a mere defense to liability. *Murray v. White*, 155 Vt. at 626, 587 A.2d at 978. Because of this purpose, discovery is not generally allowed until the immunity question is resolved. See *Siegert v. Gilley*, 500 U.S. 226, 231-32 (1991); *Harlow v. Fitzgerald*, 457 U.S. at 818. Thus, defendants must be protected from the costs associated with trial and "'the burdens of broad-reaching discovery.'" *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (quoting *Harlow v. Fitzgerald*, 457 U.S. at 818). Occasionally, discovery may be necessary to determine whether there is a bona-fide question of whether defendant's conduct violated clearly established law. See *Anderson v. Creighton*, 483 U.S. at 646-47 n.6; *Lewis v. City of Fort Collins*, 903 F.2d 752, 754 (10th Cir. 1990). We do not believe this is such a case.

We have a full record of the various documents generated in the course of the interaction of plaintiffs and Melanie with SRS and the legal system. These documents pin down and explain the relevant events and are supplemented with the affidavits of the parties. Without resolving disputed questions that go to the merits of the § 1983 claims or the damages sought by plaintiffs — for example, whether Brandi was ever sexually assaulted by Joe Vincelette — we can resolve the qualified immunity claims. We see no reason why these defendants should be put through the burden of depositions or other discovery. We hold the denial of discovery was within the discretion of the trial court.

*Affirmed.*