# Brian Dalmer, et al. v. State of Vermont, et al.

[811 A.2d 1214]

No. 99-479

Present: **Dooley, Morse, Johnson and Skoglund, JJ., and Burgess, D.J., Specially Assigned**

Opinion Filed August 15, 2002

*Harold B. Stevens*, Stowe, for Plaintiff-Appellant.

*Philip C. Woodward* and *Afi Ahmadi* of *Dinse, Knapp & McAndrew, P.C.*, Burlington, for Defendants-Appellees.

*William H. Sorrell*, Attorney General, and *James C. Shea* and *Michael O. Duane*, Assistant Attorneys General, Montpelier, for Amicus Curiae Department of Social and Rehabilitation Services.

**Dooley, J.** In December 1993, Jeremy Dalmer ran away from home for the first of five separate times during the ensuing two years. This act is at the center of this litigation. In December 1995, Brian Dalmer and his wife Colleen Dalmer, parents of Jeremy, filed this lawsuit against defendants, the Vermont Department of Social and Rehabilitation Services (SRS), Gerald Jeffords (an SRS employee), the Lamoille Family Center (LFC) and David Connor (an LFC employee), alleging: defendants negligently took and retained custody of Jeremy in violation of the Juvenile Proceedings Act, 33 V.S.A. §§ 5501-5561; defendants deprived plaintiffs of their fundamental liberty interest in family integrity in violation of their civil rights, 42 U.S.C. § 1983; SRS maliciously brought an action to terminate plaintiffs' parental rights; defendants negligently placed Jeremy in foster homes where he was neglected and did not receive proper care, food or supervision; and defendants intentionally inflicted emotional distress on plaintiffs. The trial court granted summary judgment to defendants on the civil rights claim. After testimony in a jury trial concluded, the trial court granted judgment as a matter of law on the remaining claims. Appellants then dismissed all claims against Gerald Jeffords and SRS, leaving only those against Connor and LFC. Father appeals both the summary judgment and the judgment as a matter of law as to these defendants. We affirm.

The material facts in this case are not in dispute. On December 26, 1993, Jeremy Dalmer, who was fifteen years old at the time, had an argument with his father over some house rules, including ones relating to curfews, televison viewing, snowboarding, and other issues about Jeremy's lifestyle. That night, Jeremy ran away from home. He traveled thirty-five miles by bicycle through the cold snow to a motel in Morrisville, where he stayed the night. The next day he rode his bicycle to a nearby friend's house. That day, December 27, his friend's mother contacted Washington County Youth Services, which advised her to contact SRS. She told Jeremy that she was uncomfortable with him staying at her house without his parents' permission, so he left her residence and went to the Fisk residence.

The next day, Jeremy contacted the Morrisville SRS office himself to inform them that he ran away from home. SRS referred Jeremy's case to the LFC and David Connor. LFC had a contract with SRS to run the LINK program (the Lamoille Inter-agency Network for Kids) to provide shelter and other services to unmanageable youths and runaways in the area. LINK is a program "to assist children who have run away for the purpose of reuniting them with their parents, guardian or legal custodian." 33 V.S.A. § 5511(3). Connor was the director of this program. Prior to this, Connor had no contact with Jeremy. On December 29, Connor contacted Jeremy's mother and father and told them that their son had run away from home. Connor obtained a history of Jeremy's problems from his father, who demanded that Connor return Jeremy to his parents' home. Connor refused to force Jeremy to go home because Jeremy had made it clear that, if forced to return home, he would run away again. Connor did attempt to negotiate Jeremy's return to his home, rather than calling the police to have them take Jeremy into their custody as a runaway. Father rejected Connor's attempts at reconciling the parties and continued to demand that the LFC and SRS return Jeremy to his home.

While Jeremy was staying at the Fisk residence, Connor drove him thirty miles to school each day. During the daily drives he encouraged Jeremy to return home; he also told Jeremy that he had legal options other than going home, including turning himself over to SRS custody. Despite Connor's encouragement to return home, Jeremy chose to remain with the Fisks. On January 6, 1994, at Jeremy's request, Jeremy entered the LINK shelter program and began to stay with the Stone family. At the Stone residence, Jeremy was allowed to watch television and stay out later than his parents had allowed him to when he was living at home. While Jeremy was staying with the Stones, Connor continued to encourage Jeremy to go back to his family. Jeremy also spoke with his family a number of times on the telephone and returned home to eat several meals with them.

On January 20, 1994, Connor informed Jeremy that he could no longer take advantage of the LINK program because LINK's contract with SRS allowed for only a two-week stay at a shelter. He gave Jeremy three options: go home to his family, call his family to work out an agreement with them, or turn himself in to the police. He told Jeremy that if he did not choose one of these three options, he would be considered a runaway child and the police would detain him. That same day, Connor also informed father that the LFC's contract had

ended. Jeremy did not exercise any of the three options Connor had given him. Instead, he went to the Fisk residence again, but later that night a state trooper picked Jeremy up and first took him to the state police barracks in Waterbury and then back home to his parents.

The next morning, as he promised, Jeremy ran away again; this time he took a taxi to the Morrisville police station and turned himself in as a runaway. He ran away from home again in May 1994 and a fourth time in November 1994. Finally, he ran away a fifth time in May 1995 over a dispute about his prom. After several juvenile court CHINS unmanageability hearings, the family court issued an order placing Jeremy in the legal custody of his parents and giving SRS protective supervision. Throughout the hearings, Jeremy testified that if the court ordered him to go home, he would run away again.

In December 1995, plaintiffs Brian and Colleen Dalmer sued defendants SRS, Gerald Jeffords, the LFC, and David Connor, listing the five causes of action set out at the beginning of this opinion. The trial court granted summary judgment for defendants on the civil rights and malicious prosecution claims. After hearing plaintiffs' evidence, the court granted defendants judgment as a matter of law on the remaining claims. Following the final judgment, plaintiffs dismissed all claims against SRS and Gerald Jeffords, leaving only the claims against the LFC and David Connor for our review. They have raised issues with respect to each of the counts except the malicious prosecution count.

Our understanding of the issues on appeal is somewhat affected by the confusing series of amendments, or attempted sets of amendments, to the complaint that added and dropped parties and significantly modified the central issues in the case. On the eve of trial, plaintiffs attempted to amend their complaint to modify the first and fourth causes of action. Significantly, that proposed amendment also appeared to change the parties, identifying the plaintiffs only as "Brian Dalmer and Jeremy Dalmer."

The most important amendment changed the first count from one that alleged a violation of the Juvenile Procedures Act to one that alleged that defendants were negligent or grossly negligent by taking and keeping custody of Jeremy in violation of the Juvenile Procedures Act. Plaintiff called this a "negligence per se" count. Although this amendment was never formally authorized, the court and parties proceeded as if it had occurred. See V.R.C.P. 15(b).

Plaintiffs also attempted to amend the fourth count, which alleged defendants were negligent in placing and supervising Jeremy in

certain foster homes. This amendment was never formally authorized. None of plaintiffs' arguments on appeal appear to relate to this count. We therefore need not determine whether the amendment occurred.

Plaintiffs' first two appeal issues relate to the trial court's resolution of their negligence claim. As discussed above, we address these issues in relation to the first amended count. In practical terms, this means we are addressing the actions of defendants only up to and including January 1994 — that is, only with respect to the first time Jeremy ran away from home. Although the proper parties were never clearly resolved, we will assume that by the time of trial the plaintiffs were Brian and Jeremy Dalmer. With that background in mind the first two issues are: (1) whether the court erred in concluding that "plaintiffs did not have a presumed negligence claim against defendants for violation" of 33 V.S.A. § 5512(c); and (2) the court erred in holding that a jury could not find that defendants were negligent and that there was no proximate cause.

The logical progression of plaintiffs' first argument is as follows: defendants violated 33 V.S.A. §§ 5511, 5512(c) by failing to return Jeremy to his father after 7 days; §§ 5511 & 5512(c) are safety statutes so violation is negligence per se; the court erred in failing to submit plaintiffs' negligence per se case to the jury. We cannot accept any of the steps of this argument.

The statutory sections on which plaintiffs rely deal generally with the taking of juveniles into custody, normally prior to the formal commencement of juvenile proceedings. Title 33, § 5510 specifies four methods by which a juvenile may be taken into custody: (1) by arrest; (2) by order of the juvenile court; (3) by a law enforcement officer who has reasonable grounds to believe that a "child is in immediate danger from his surroundings"; and (4) by a law enforcement officer who has reasonable grounds to believe that the child "has run away from his parents, guardian, or legal custodian."[1] The person who takes custody of a child has three options: (1) to release the child to the child's parents, guardian or custodian; (2) to deliver the child to the juvenile court; and (3) in case of a runaway child, a law enforcement officer can deliver the child to an organization designated by SRS "as qualified to assist children who have run away for the purpose of reuniting them with their parents, guardian or legal custodian." *Id.* § 5511(3). Under § 5512(a), SRS "shall designate shelters throughout the state where a child taken into custody pursuant to section 5510(4) of this title may be

---

[1] Sections 5510 and 5511 were amended after the trial of this case. See 2001, No. 41, §§ 5,6. The amendments have no bearing on the issues before us.

housed for a period not to exceed 7 days." When a child is delivered to a designated shelter program, the program director or designee must notify the parents, guardian or custodian "that the child has been taken into custody," *id.* § 5512(b)(1), and attempt "to mediate the differences between the parties," *id.* § 5512(b)(2). During the time that the child is in the shelter, legal custody of the child remains with the parent unless the juvenile court otherwise orders. *Id.* § 5512(d). Upon the expiration of the 7 day period set out in § 5512(a) or at the request of the child or parents, the child must be released to the child's parents, guardian or custodian or a law enforcement officer who must deliver the child to the juvenile court pursuant to § 5511(2). *Id.* § 5512(c).

Plaintiffs allege that defendants took Jeremy into custody and failed to deliver him to his parents as required by § 5512(c). Alternatively, they allege that defendants were required by § 5511 to deliver Jeremy to his parents or the juvenile court.

■As the superior court held, plaintiffs' arguments fit neither the facts nor the law. Plaintiffs particularly rely upon § 5512(a) which authorizes that children taken into custody under § 5510(4) be housed for no more than 7 days and argues that defendants held Jeremy over 7 days.[2] By its terms, however, the limit applies only to children taken into custody under § 5510(4) — that is, by a law enforcement officer. No law enforcement officer was involved in this case during the period covered by plaintiffs' argument. If Jeremy was held in physical custody, it was not by a law enforcement officer.

We emphasize that the absence of the involvement of a law enforcement officer is not a technicality in this context. Under § 5510, the Legislature limited the persons who could take custody of a child without a court order. If defendants took custody of Jeremy, as plaintiffs allege, they did so unlawfully. Cf. *State v. Sullins*, 509 N.W.2d 483, 484-85 (Iowa 1993) (where statute provides that peace officer may take protective custody of a child, juvenile court officer was not a peace officer and had no authority to take such protective custody).

■More broadly, we agree with defendants that they did not hold Jeremy in custody as a matter of law. We are reviewing a judgment as

---

[2] The 7-day limit of § 5512(a) is largely irrelevant to this case because § 5512(c)(1) requires the shelter to return the child to the child's parents when the parents request such return. It is undisputed that Jeremy's father consistently sought the return of Jeremy from the first contact by Connor.

a matter of law, and in such circumstances, we employ the same standard as the trial court. See *Gero v. J.W.J. Realty*, 171 Vt. 57, 59, 757 A.2d 475, 476 (2000).[3] Judgment as a matter of law may be granted where " 'there is no legally sufficient evidentiary basis for a reasonable jury to find for [the nonmoving] party.' " *Brueckner v. Norwich University*, 169 Vt. 118, 122, 730 A.2d 1086, 1090 (1999) (quoting V.R.C.P. 50(a)(1), (b)) (alteration in original). Under the rule, we must consider the evidence in the light most favorable to the nonmoving party, excluding the effect of any modifying evidence. See *id.*

The Juvenile Procedures Act does not define "custody," but it does define "legal custody" as the legal status created by order of the juvenile court which invests in a party "the right to have the physical possession of a minor and to determine where and with whom he shall live, the authority to consent to major medical, psychiatric, and surgical treatment, and the right and duty to protect, train, and discipline him and to provide him with food, shelter, education and ordinary medical care." 33 V.S.A. § 5502(a)(10). We recognize that with respect to a runaway child in a shelter, the status plaintiffs argue Jeremy was in, the parents retain "legal custody." *Id.* § 5512(d). Reading the sections together, we believe the intent is that the custodian under §§ 5510, 5511, and 5512 has only physical custody, that is, the physical possession of the child. In other contexts, physical custody is defined in terms of possession or restrictions on liberty. See 15 V.S.A. § 1031(8) (under Uniform Child Custody Jurisdiction Act, physical custody means "actual possession and control"); *State v. Wargo*, 168 Vt. 231, 234, 719 A.2d 407, 409 (1998) (for purposes of post-conviction relief statute and V.R.Cr.P. 32(d), custody means a significant restraint of personal liberty).

There was no evidence that LFC or Connor had physical possession of Jeremy or imposed restrictions on his liberty. Originally, Jeremy lived in the home of his choice. Thereafter, for two weeks, LFC allowed him to live in the shelter home of the Stones which enabled Jeremy to go to his home school. Although this may have been a shelter home that pursuant to § 5512(a) could be used for a child taken into custody, there is no evidence it was being used for that purpose in this case. Jeremy resided there voluntarily while Connor kept unsuccessfully trying to persuade him to return home.

---

[3] Plaintiffs argue that the superior court found that a jury question existed on whether defendants took physical custody of Jeremy, and we are bound by this ruling. We disagree. Because the standard of review of a judgment as a matter of law is the same as that employed by the trial court, our review is nondeferential.

Plaintiffs argue that Connor should have returned Jeremy to his home against his will. They also complain that Connor acted improperly in discontinuing services after Jeremy's time at the Stone shelter came to an end without ensuring his safety. Thus, although they claim that Connor and LFC had custody as part of the argument that defendants violated the statute, the nucleus of their substantive claim is that defendants *failed* to take custody of Jeremy and perform the acts they wanted. As we discussed above, defendants had no legal right to take custody of Jeremy without the intervention of a law enforcement officer. Their failure to act as plaintiffs demand shows that Connor and LFC never had custody in the first instance.

Even if we could agree that plaintiffs showed that defendants violated the statutes, we cannot agree that this violation is negligence per se. Proof of violation of a safety statute or regulation creates a prima facie case of negligence. See *Bacon v. Lascelles*, 165 Vt. 214, 222, 678 A.2d 902, 907 (1996). The statutes or regulations that we have held have this effect have directly been concerned with the safety of persons in the position of plaintiff to avoid the kind of harm plaintiff suffered. See *id.* at 223, 678 A.2d at 907 (fire safety code); *Weeks v. Burnor*, 132 Vt. 603, 607, 326 A.2d 138, 140 (1974) (rule of the road); *Landry v. Hubert*, 101 Vt. 111, 113, 141 A. 593, 593 (1928) (same); *Wakefield v. Connecticut & Passumpsic Rivers R.R.*, 37 Vt. 330, 333 (1864) (railroad safety statute); *Marzec-Gerrior v. D.C.P. Indus., Inc.*, 164 Vt. 569, 571, 674 A.2d 1248, 1249 (1995) (occupational safety regulations). In *Estate of Kelley v. Moguls, Inc.*, 160 Vt. 531, 534, 632 A.2d 360, 362 (1993), we adopted Restatement (Second) of Torts § 286 (1965), which defines the elements of a safety statute or regulation that has this effect. The statute or regulation must be intended at least in part:

> (a) to protect a class of persons which includes the one whose interest is invaded, and
> (b) to protect the particular interest which is invaded, and
> (c) to protect that interest against the kind of harm which has resulted, and
> (d) to protect that interest against the particular hazard from which the harm results.

*Id.*; see also *id.* § 288. The primary purpose of the Juvenile Procedures Act is to protect the welfare of children. See 33 V.S.A. § 5501(a); *In re R.B.*, 152 Vt. 415, 420, 566 A.2d 1310, 1312 (1989). Only in the broadest sense can the act be said to be a safety statute.

Again, our ability to resolve plaintiffs' argument is limited by the confused state of the pleadings and the vague statement of plaintiffs' claims. Apparently, plaintiffs' position is that if defendants had immediately taken custody of Jeremy in December of 1993 or early January of 1994 and returned him to his parents, Jeremy would have understood that he had no option but to stay with his father and follow his rules. The complaint alleges that as a result of defendants' actions Brian Dalmer "lost the love, society, affection and companionship of Jeremy for a number of years," had to "expend money on legal and expert fees and court costs" in fighting subsequent SRS interventions after the remaining runaway incidents, suffered "public scorn, ridicule, and severe emotional stress"; and incurred medical and psychiatric bills for therapy for Jeremy. Presumably, these are the items of damage from which we can derive the interests that plaintiff, Brian Dalmer, seeks to protect. Although we have no specification of Jeremy's alleged damages, we assume they are similar.

Plaintiffs rely upon statutes that require that those taking custody of a juvenile act within a specified time limit to take the child to the court or to return the child to his or her parents. The purpose of these statutes is to ensure due process of law in the administration of the juvenile procedure act. See *In re Proceedings Concerning a Neglected Child*, 130 Vt. 525, 531-32, 296 A.2d 250, 254 (1972); *Gottlieb v. County of Orange*, 84 F.3d 511, 520 (2d Cir. 1996) (if child removed from parents' home without prior judicial authorization, parents must have an opportunity for a hearing "at a reasonably prompt time after the removal"). Although they generally protect the interests of children and their families to a neutral adjudication of whether grounds exist for state intervention, we do not believe that they are intended to protect the interests of either Brian or Jeremy Dalmer against the kind of harm they allege has resulted or against "the particular hazard from which the harm results." Restatement (Second) of Torts § 286(d); see *Claypool v. Hibberd*, 626 N.W.2d 539, 545-46 (Neb. 2001) (statute that requires officer to notify parents on detaining a child ensures due process of law and is not intended to prevent the child from harming himself); cf. *Johnson v. State*, 165 Vt. 588, 589, 682 A.2d 961, 963 (1996) (mem.) (motel licensing law did not impose any duties with respect to the purchaser of a motel beyond those owed to the public as a whole); *Andrew v. State*, 165 Vt. 252, 258, 682 A.2d 1387, 1391 (1996) (inspection duties imposed by law on VOSHA agency are aimed at protecting the health and safety of the public as a whole and not a particular employee who is injured); *Denis Bail Bonds, Inc. v. State*,

159 Vt. 481, 489, 622 A.2d 495, 499-500 (1993) (state agency's obligation to enforce regulatory laws over bail bondsmen does not create liability to notify bonding company of complaints; any duty agency had was for the protection of the public rather than bonding company).

Even if the sections of the Juvenile Procedures Act were safety statutes, our law is not that violation of the statutes is negligence per se, as plaintiffs argue. See *Cooper v. Burnor*, 170 Vt. 583, 585, 750 A.2d 974, 976 (1999) (mem.) (violation of safety statute creates only a rebuttable presumption of negligence which disappears on the production of any evidence to the contrary); *id.* at 586-87, 750 A.2d at 977 (Dooley, J., dissenting and advocating change to negligence per se rule); *Marzec-Gerrior*, 164 Vt. at 576, 674 A.2d at 1252. Instead, it is that violations of safety statutes create rebuttable presumptions of negligence. As the trial judge held, the main effect of such a violation would have been in the charge to the jury, if that had occurred.

This brings us to the third step of plaintiffs' logic in this case: that as a result of the violation of the Juvenile Procedures Act, plaintiffs introduced sufficient evidence to reach the jury on Count I of the complaint, their negligence per se count. It is here that we have the most difficulty with plaintiffs' theory of the case. Negligence is an unintentional tort based on the failure of the defendant to perform a duty with due care resulting in injury to the plaintiff. See Restatement (Second) of Torts § 282 cmt. d. (contrasting negligence with intentional torts). This case is a dispute over the right of defendants to take certain actions with respect to a runaway child, consistent with their assumed role as an intermediary between the parents and their child. Every act of Connor about which plaintiffs complain was done intentionally and pursuant to policy of LFC. See *Hockensmith v. Brown*, 929 S.W.2d 840, 845 (Mo. Ct. App. 1996) (theories of intentional tort and negligence are mutually exclusive). Plaintiffs do not complain that defendants committed malpractice or otherwise were professionally negligent; instead they complain that defendants had no right to intervene. Nor is this a case in which it could be said that defendants were negligent with respect to the alleged harm. Connor expected that his actions would keep Jeremy separated from his parents unless a negotiated settlement was reached and that Jeremy would become aware of his legal options.

This case is vastly different from *Sabia v. State*, 164 Vt. 293, 669 A.2d 1187 (1995), the case on which plaintiffs primarily rely. In *Sabia*, we held, based on specific statutes that define the responsibilities of SRS social workers, that plaintiff children could bring a negligence

action against the State based on the failure of the workers to protect them after they had knowledge of continuing sexual assaults on them by their stepfather. Unlike this case, the statutes relied upon in *Sabia* were intended to protect plaintiffs from the harm that occurred and thus gave rise to a duty of care. *Id.* at 299-300, 669 A.2d at 1191-92. Plaintiffs alleged that the workers were professionally negligent.

Whether we view this as an intentional tort action, or an action for damages caused by violation of the statute, it is not a negligence action. Plaintiffs' labels alone cannot control the substance of the case. See *Benavidez v. United States*, 177 F.3d 927, 931 (10th Cir. 1999) (allegation of negligence cannot turn an intentional tort into negligent conduct); *United National Ins. Co. v. The Tunnel, Inc.*, 988 F.2d 351, 354 (2d Cir. 1993) (plaintiff cannot prevail by dressing up intentional tort action as a negligence action). We have recognized this principle in cases where a plaintiff labels an alleged intentional tort as negligent conduct in order to achieve insurance coverage. See *T.B.H. v. Meyer*, 168 Vt. 149, 153, 716 A.2d 31, 34 (1998) ("We must focus on the factual allegations in [the] complaint and not on the legal theories asserted . . . ."); *Nationwide Mut. Fire Ins. Co. v. Lajoie*, 163 Vt. 619, 620, 661 A.2d 85, 86 (1995) (mem.).

We have one particularly relevant precedent. In *Cronin v. State*, 148 Vt. 252, 531 A.2d 929 (1987), plaintiff state employee alleged that defendants, supervisory employees and the State, were negligent in disclosing confidential information that resulted in plaintiff's wife finding out that plaintiff was thought to be having an affair with another woman. Plaintiff grounded his negligence action on a personnel regulation that prohibited employees from disclosing certain confidential information. We did not examine whether the regulation created a rebuttable presumption of negligence, as plaintiffs argued in this case, or whether the regulation created a duty on which a negligence action could be premised. Instead, we analyzed the case as one in which plaintiff was seeking to create an implied private cause of action for violation of the statute, and finding that the Legislature intended no such private right of action, *id.* at 255, 531 A.2d at 931, we upheld dismissal of the relevant counts of the complaint. *Id.*; see also *Corbin v. Buchanan*, 163 Vt. 141, 144-47, 657 A.2d 170, 172-74 (1994) (relying on *Cronin*, no private right of action against town for failure to enforce provisions of building and fire protection codes).

We conclude that *Cronin* represents the proper way to analyze this complaint. As set forth in § 874A of the Restatement (Second) of Torts, creating a civil tort remedy for violation of a statute is proper only if

the statute "protects a class of persons by proscribing or requiring certain conduct" and "the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision." Restatement (Second) of Torts § 874A (1979); see also *Cronin*, 148 Vt. at 255, 531 A.2d at 931 (personnel rule creates no duty running from defendants to plaintiff and would frustrate the legislative scheme); *Carr v. Peerless Ins. Co.*, 168 Vt. 465, 473-74, 724 A.2d 454, 459 (1998); *Shields v. Gerhart*, 163 Vt. 219, 232, 658 A.2d 924, 933 (1995) (Court has been "cautious in creating a private damage remedy even where the Legislature has provided no alternative civil remedy"); *O'Brien v. Island Corp.*, 157 Vt. 135, 140 n.3, 596 A.2d 1295, 1298 n.3 (1991) (citing § 874A, Court is hesitant to create a private remedy where "it is clear that the Legislature could have done so, knew it could do so, and did not do so").

As discussed above, we cannot conclude that the statute was intended to protect plaintiffs with respect to the harm that they allege. Moreover, we believe that civil liability would frustrate the legislative purpose, as recognized in 33 V.S.A. § 5511(3), for the State to fund intermediary programs like LINK to negotiate the reuniting of a runaway child and the child's parents. Plaintiffs' position is that such an intermediary negotiation role is never proper; the only proper action when a state official or an employee of a state funded program comes across a runaway child is for that person to take the child home, involuntarily if necessary. If the courts imposed civil liability for the conduct intended by a program that the Legislature authorized, we would undermine the legislative authorization.

█ Our discussion above largely disposes of plaintiffs' second claim — that they showed enough to reach the jury on their negligence theory, irrespective of the statutory violation. Plaintiffs do suggest a somewhat different theory under this second claim, that is, that defendants negligently rendered services to Jeremy, although they return to their familiar arguments that the negligence occurred in not returning Jeremy to his parents or informing the parents of Jeremy's location and in discontinuing services without an alternative.

In any event, the superior court disposed of this claim by granting defendants judgment as a matter of law because plaintiffs failed to show that defendants' negligence was a proximate cause of the alleged harm. In reaching this conclusion, the trial court particularly relied upon the fact that Jeremy immediately ran away again when returned to his parents' home and ran away three more times thereafter.

Plaintiffs concede that they must establish proximate cause in order to recover. See *Cannata v. Wiener*, 173 Vt. 528, 530, 789 A.2d 936, 938 (2001) (mem.). They argue that the testimony of Jeremy establishes the necessary link between defendants' actions and their harm. The testimony was in response to a question whether if he had been returned home on January 5 or 6, he would have stayed home:

> If the response to my running away had been to bring me back in general, then things would have been a lot different and, no, I wouldn't have continued to leave. That may have happened a couple of more times, sure. But, you know, things would have changed. It would have been different.

The standard for determining whether to grant judgment as a matter of law is set out above. We conclude that under this standard the trial court properly granted judgment as a matter of law.

Irrespective of his testimony, Jeremy stated he would run away again if returned to his parents' home, and he did run away when that occurred. Moreover, he admitted in his testimony that he would have run away "a couple of more times" and that also happened. At best, plaintiffs can argue from the testimony that Jeremy would have run away fewer times if defendants had brought him home. Unlike SRS and its worker, whom plaintiffs let out of this case before the appeal, defendants had only a brief contact with Jeremy at the beginning of a lengthy process of state intervention to protect Jeremy's welfare. We believe that it is too speculative to conclude that different actions by defendants would have avoided the injuries plaintiffs allege.

We reach the same conclusion with respect to plaintiffs' claim that defendants were negligent in discontinuing services for Jeremy after the expiration of 14 days at the Stone home. While the evidence shows that defendants discontinued services, it fails to show that either Jeremy or his parents suffered any injury from the cessation of services. Jeremy was picked up almost immediately by a law enforcement officer and returned to his parents' home, exactly what plaintiffs allege was the proper course of action.

Next, plaintiffs argue that the court erred by granting summary judgment in favor of defendants on plaintiffs' claim that defendants violated their civil rights by interfering with "the training and relations between parent and child." Plaintiffs argue that Connor interfered with father's constitutionally protected custodial rights over Jeremy by taking "unlawful custody of Jeremy without [father's] consent or permission without any reason or basis to do so."

We conclude that plaintiffs waived this claim of error, at least in part. Only SRS and Jeffords moved for summary judgment in writing on this count of the complaint. Following the argument over this motion, counsel for LFC and Connor argued that any favorable ruling on the summary judgment motion should also apply to LFC and Connor. Plaintiffs' counsel agreed with this position. Based on this agreement, the trial court stated that it would issue its rulings with respect to SRS and Jeffords and follow that with the same decision for LFC and Connor, unless in the meantime, plaintiffs filed an argument why all four defendants should not be treated alike.

Plaintiffs never made an argument to differentiate between SRS and Jeffords, on the one hand, and LFC and Connor on the other. A month after the argument, the trial court granted summary judgment for SRS and Jeffords on the civil rights count, holding that SRS is not a "person" as defined in the Act and under this Court's decision in *Billado v. Appel*, 165 Vt. 482, 489, 687 A.2d 84, 89 (1996), Jeffords was entitled to qualified immunity. Thereafter, it issued a summary judgment on this count on behalf of Connor and LFC "for the reasons expressed on the record."

Plaintiffs now argue here that qualified immunity does not apply to LFC and Connor because they are not state officials. We believe this argument is foreclosed by plaintiffs' agreement at trial that all defendants should be treated the same, and their failure to make a written argument to the contrary. Furthermore, we agree with defendants that the trial judge's ruling was correct. Plaintiffs' substantive claim is indistinguishable from that made in *Billado*. We decline plaintiffs' invitation to overrule *Billado*.

Even without a waiver, we need not address the merits of plaintiffs' argument. Plaintiffs admit that a necessary element of their claim is that defendants took custody of Jeremy. As we set out above, defendants' custody of Jeremy was also an element of plaintiffs' claim that defendants violated 33 V.S.A. §§ 5511 and 5512(a), and, as a matter of law, plaintiffs failed to show such custody at trial. Thus, even if the summary judgment decision was wrong, plaintiffs' civil rights act count would also have been properly dismissed at trial. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986) (standards for summary judgment and judgment as a matter of law are essentially the same). Any error in resolving the summary judgment motion was harmless. See *Jakab v. Jakab*, 163 Vt. 575, 580, 664 A.2d 261, 263 (1995) (in the absence of prejudice to appealing party, erroneous ruling is harmless).

■ Finally, plaintiffs argue that the court erred in granting judgment as a matter of law on plaintiffs' claim that Connor and LFC intentionally inflicted emotional distress on them. To prove intentional infliction of emotional distress, plaintiffs must show " 'outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct.' " *Crump v. P & C Food Markets, Inc.*, 154 Vt. 284, 296, 576 A.2d 441, 448 (1990) (quoting *Sheltra v. Smith*, 136 Vt. 472, 476, 392 A.2d 431, 433 (1978)). As a threshold issue, the trial court must determine whether the conduct was so extreme and outrageous that a jury could reasonably find for the plaintiff. See *Denton v. Chittenden Bank*, 163 Vt. 62, 66, 655 A.2d 703, 706 (1994). The standard for establishing outrageous conduct is necessarily a high one. The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 cmt. d; see *Demag v. Am. Ins. Cos.*, 146 Vt. 608, 611, 508 A.2d 697, 699 (1986) (plaintiff has "heavy burden to make out a case of outrageous conduct").

As we discussed earlier in this opinion, when reviewing a judgment granted as a matter of law, we must view the evidence in the light most favorable to the nonmoving party and exclude the effects of modifying evidence. See *Gero*, 171 Vt. at 59, 757 A.2d at 476. Much of the analysis of this claim is determined by our conclusions above, particularly our conclusion that defendants never had custody of Jeremy. We add that, in any event, the statutory violation alleged by plaintiffs does not, alone, make defendants' conduct outrageous. See *Bigby v. Big 3 Supply Co.*, 937 P.2d 794, 800 (Col. Ct. App. 1996) (violation of Colorado Anti-Discrimination Act in firing plaintiff does not make the conduct outrageous).

In arguing against the trial court action plaintiffs also recite father's testimony that after Jeremy ran away, but before he entered the LINK program, Connor refused to tell father where Jeremy was and told father that there was no use in calling the police because Jeremy did not want to return home and Connor was taking care of Jeremy. Father urges us to conclude that this interaction and other similar interactions amount to an abuse of Connor's position sufficient to meet the high standard for outrageous conduct. Even if we accept as true father's testimony and exclude any modifying evidence, these conversations do not meet the standard for outrageous conduct. See

*Denton*, 163 Vt. at 66, 655 A.2d at 706 ("We have never extended liability to 'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' ") (quoting Restatement (Second) of Torts § 46 cmt. d). The trial court correctly granted judgment as a matter of law on plaintiffs' claim of intentional infliction of emotional distress.

*Affirmed.*