Thomas WILKINSON, Benjamin Wilkinson, by next friend Thomas WILKINSON and Jonathan Wiegand, Plaintiffs–Appellants,

v.

Caroline S. RUSSELL, James Adams and Gerald Jeffords, Defendants–Appellees.

Docket No. 98–7663.

United States Court of Appeals, Second Circuit.

Argued Nov. 17, 1998.

Decided June 17, 1999.

Harold B. Stevens III, Stowe, Vermont, for Plaintiff-Appellants

Michael O. Duane, Assistant Attorney General, Waterbury, Vermont (William H. Sorrell, Attorney General for the State of Vermont), for Defendant–Appellees

Before: CALABRESI, SACK and SOTOMAYOR, Circuit Judges.

Judge Calabresi concurs by separate opinion.

SOTOMAYOR, Circuit Judge:

Plaintiffs appeal from two decisions rendered by Judge William K. Sessions in an action before the United States District Court for the District of Vermont. First, plaintiffs contend that the trial court erred in its July 31, 1997 grant of summary judgment, which dismissed plaintiffs' claims of libel and slander and negligence *per se*. *Wilkinson v. Russell*, 973 F.Supp. 437 (D.Vt.1997). Second, plaintiffs appeal from the trial court's April 3, 1998 grant of defendants' Rule 50(a) motion for judgment as a matter of law, which dismissed plaintiffs' remaining federal and state law claims. *Wilkinson v. Russell*, No. 2:94–CV–175 (D.Vt. Apr. 3, 1998). For the reasons to be discussed, we affirm both decisions.

## BACKGROUND

Thomas Wilkinson initiated this action, on behalf of himself and his son, Benjamin, asserting various federal and state law claims arising out of an allegedly inadequate child abuse investigation conducted by the defendant social workers. Wilkinson complained that defendants wrongfully substantiated allegations by his estranged wife, Linda Wiegand, that he had sexually abused Benjamin. Wilkinson further complained that defendants improperly disclosed the results of their faulty investigation, which also implicated Wilkinson in the sexual abuse of his stepson, Jonathan, to officials working on behalf of the family court in Connecticut then presiding over divorce and custody proceedings between Wilkinson and Wiegand.

## A. Factual History

Wilkinson initiated the Connecticut divorce proceedings against Wiegand in September 1992, seeking joint custody of their child Benjamin, who was born on January 8, 1989. Wiegand opposed joint custody and, almost immediately upon being served with the divorce complaint at her Connecticut home, moved to Stowe, Vermont with both Benjamin and Jonathan Wiegand, her son from a previous marriage.

In December 1992, Dr. Gordon Ahlers, a family physician, recommended to Wiegand that she take her sons to meet with Dr. Stephen Balsam, a licensed child psychiatrist. Dr. Ahlers had become concerned about the boys when members of his staff reported that the children were using inappropriate sexual language and behaving violently in the office waiting area. Later that month, Wiegand began visiting Dr. Balsam in Burlington, Vermont. At the end of her second session with Balsam, Wiegand voiced concerns that Wilkinson had been sexually abusing both Benjamin and Jonathan. Dr. Balsam met with the boys for the first time on January 6, 1993, and, on the basis of that single visit, concluded that Wilkinson was abusing both children. Dr. Balsam advised Wiegand to keep Jonathan and Benjamin away from Wilkinson, to have the boys examined by a physician, and to report the sexual abuse to the Vermont authorities.

At Dr. Balsam's suggestion, Wiegand returned with her children to see Dr. Ahlers on January 14, 1993. Dr. Ahlers examined each child, but found no physical signs of abuse. Nevertheless, on January 15, Wiegand placed an anonymous phone call to the Vermont Department of Social and Rehabilitation Services (the "SRS"). Wiegand reported that she was aware of a possible claim of abuse and inquired into the manner in which the SRS would respond to such allegations. The SRS caseworker who received the call, Jane Clark, explained that the SRS would investigate any formal complaints.

On January 18, 1993, Wiegand again called Clark, this time identifying herself and requesting a meeting. Clark met with Wiegand shortly thereafter, listened to Wiegand's allegations that Wilkinson had abused both Benjamin and Jonathan, and reviewed a number of sexually explicit drawings by both children. Clark also consulted with Dr. Balsam, who phoned to explain that he had met with the children two or three times during the previous month and that he was convinced that Wilkinson had in fact abused his son and step-son. On January 20, defendant Gerald Jeffords, an SRS supervisor, reviewed Clark's intake forms and assigned defendant James Adams, an SRS caseworker with more than twenty years' experience, to investigate the reported abuse.

On January 21, 1993, Adams separately interviewed each child, Benjamin and Jonathan, at the Stowe Police Department in the presence of Detective Bruce Merriam. Wiegand consented to the interviews, but Wilkinson was never contacted. A transcript of the taped interview with Benjamin (but not of the taped interview with Jonathan) was entered into evidence at trial. That transcript revealed that during his interview with Adams and Merriam, Benjamin implicated Wilkinson in assorted episodes of sexual abuse. Benjamin's comments, moreover, were exceedingly graphic. In describing the alleged sexual abuse, Benjamin volunteered numerous details that suggested sexual knowledge highly unusual for a four year old child.

Although Benjamin provided detailed accounts of several incidents of apparent sexual abuse, the transcript reveals considerable problems with the boy's version of events. For instance, Benjamin offered many of his comments in response to leading questions. (*See, e.g.,* Transcript from 1/21/1993 child interview (Tr.) at 5 (Q: "Does this mean that Daddy's doing some things you don't like?").) Also, some of the child's accusations were implausible.

Benjamin described an incident in which his father "cut [his] eye out," leaving Benjamin with only "one eye." (Tr. at 17–18.) Although Adams conceded at trial that this claim was "a bit fantastic," he had no explanation for failing to follow up on the child's bizarre comments beyond the fact that "it was clear that he had both eyes." (4/1/98 Trial Tr. at 141, testimony by James Adams.) Finally, although Benjamin at times insisted that his comments were true, at other times he expressly indicated that his mother had prompted him to make up his claims against Wilkinson. (See, e.g., Tr. at 11 (A: "She makes me say it. I did it for mom.").) Despite these assorted problems, defendant Adams recommended that the SRS substantiate [1] Wiegand's report that Wilkinson was guilty of abusing Benjamin.

Detective Merriam, for his part, followed up on the two interviews by contacting Dr. Balsam, who once again expressed his view that Wilkinson was guilty of sexual abuse. Merriam also spoke with Dr. Ahlers, who reported finding no physical evidence of abuse, and with Wiegand, who reiterated her concerns regarding the alleged sexual molestation. Finally, Merriam spoke with Wiegand's landlord and visited her home in Vermont to confirm that the lay-out was consistent with the boys' comments.[2] Based on his interviews with the children along with the results of his separate investigation, Merriam swore out an affidavit of probable cause against Wilkinson. On January 25, 1993, following Merriam's submission of his affidavit to a Vermont state court, Wilkinson was arrested and charged with sexually abusing Benjamin. Wilkin-son pled not guilty and was released on $20,000 bail on the condition that he have no contact with Benjamin or with Jonathan. Wilkinson did not see either boy again for over nine months.

Shortly after Wilkinson's arrest, on January 27, 1993, the Vermont State Attorney's Office notified Adams that Wiegand's nephew (her sister's son) had complained to his father, Craig Martin, that Wiegand had sexually abused him. Adams responded by calling Martin on February 2. Martin, however, refused to permit Adams to speak with his son and insisted that no abuse had taken place. According to Adams's undisputed trial testimony, he subsequently called Dr. Balsam to discuss this episode and to raise the possibility that Wiegand was coaching her own children to make false allegations against their father. Balsam rejected this possibility, however, and reiterated his view that Wiegand was trustworthy. Adams took no further steps to investigate either Wiegand's possible abuse of her nephew or the possibility that Wiegand was coaching her own children to claim abuse.

In a letter dated February 9, 1993, Adams and his supervisor, Jeffords, notified Wilkinson that the SRS had substantiated the report of child abuse involving Benjamin. Wilkinson thereafter initiated an appeal process to the state Human Services Board, claiming that Wiegand had coached the children to make their allegations in retaliation for his seeking joint custody of Benjamin in the Connecticut divorce action. He further maintained that this coaching itself constituted abuse and placed the children at risk. Jeffords

1. "Substantiation" refers to an agency determination, after an investigation, that a report of abuse "is based upon accurate and reliable information that would lead a reasonable person to believe that the child has been abused or neglected." 33 Vt. Stat. Ann. § 4912(10) (1991). The SRS maintains a registry containing records of all investigations of abuse and neglect. Once a report of abuse is "substantiated," the identity of the individual complained about is entered in the registry, which is available only to social workers, child pro-tection workers, state's attorneys, the child's parents or guardian, and the individual concerned. 33 Vt. Stat. Ann. § 4916(a)-(e) (1991).

2. Although the timing of their discussions is not altogether clear, it was Merriam's and Adams's undisputed testimony that Merriam "updated" Adams on the progress of his investigation in the days and weeks immediately following the two child interviews.

responded by letter on February 25, 1993, declining to investigate possible abuse by Wiegand and indicating that the SRS considered its investigation complete and the "case ... closed."

As the first stage in the appeal process, and in an effort to persuade the SRS to drop its substantiation determination, Wilkinson attended a meeting on March 16, 1993, with Adams, Jeffords and Caroline Russell, the Director of the SRS office. Russell received affidavits from Wilkinson and heard evidence, including testimony from Wilkinson explaining his view that Wiegand was mentally unstable and that she had coached her sons to make false allegations of abuse in order to retain custody of Benjamin. Following the hearing, Russell contacted Balsam, who once again confirmed his belief that Wilkinson was guilty of abuse and that no coaching had occurred. On the same day that she spoke with Balsam, March 19, 1993, Russell issued a letter decision upholding the SRS substantiation determination.

After receiving Russell's decision, Wilkinson requested a hearing before the Human Services Board. On May 3, 1993, however, Wilkinson and the SRS entered into a written consent agreement to stay Wilkinson's next level of appeal pending the outcome of the ongoing criminal and divorce actions. The agreement provided further that, "[i]n the interim, SRS will remove Thomas Wilkinson's name from its registry as well as its substantiation of sexual abuse against him."

On July 7, 1993, Judge Herbert Barall, the presiding judge in the child custody dispute between Wilkinson and Wiegand in Connecticut, ordered the Connecticut Department of Children and Families ("DCF") to ask the Vermont SRS "to say what's going on." On July 13, Caroline Russell returned a phone call from Paul Shanley of the Connecticut DCF. Shanley told Russell that he had been ordered by the Connecticut court to contact the SRS to obtain information to answer Judge Barall's concerns regarding the welfare of the children. Russell provided Shanley with information over the phone, explaining specifically that the SRS had substantiated claims of abuse against Wilkinson.

Following her phone call with Shanley, Russell contacted an attorney at the Deputy Attorney General's Office, who advised her that the SRS had a responsibility to provide DCF with additional information about the SRS's involvement in the case. Based on this advice, and notwithstanding the consent agreement, Russell wrote to the Connecticut DCF. In her July 15 letter, Russell explained that her office had substantiated claims of abuse by Wilkinson against Benjamin and that the SRS had further determined that Wilkinson had abused Jonathan. Russell urged the Connecticut court that granting custody of the children to Wilkinson's sister, as was then under consideration, could place the children "at great risk of harm." Shanley presented Russell's letter, along with a report of his investigation, to the Connecticut Attorney General's Office. The Attorney General's Office, in turn, forwarded these materials to Judge Barall.

After receiving Shanley's materials, and before making any final decision regarding custody, Judge Barall appointed Dr. Kenneth Robson to evaluate the family. Dr. Robson met with Wilkinson, Wiegand, both children, Dr. Balsam, and others. He also reviewed the transcripts of Adams's interviews with the children, the sexually explicit drawings by both children and assorted other written material. Robson completed a report of his investigation in December 1993. Addressing Adams's interview with Benjamin, Dr. Robson expressed grave concern about many of the problems already discussed—e.g., the leading questions, the express claims of coaching and Benjamin's description of fantastic and implausible events. Robson's report also included several quotations from Jonathan's interview. These brief excerpts suggest that Jonathan denied being abused but claimed to have witnessed Wilkinson abusing Benjamin. These excerpts

also suggest that, unlike Benjamin, Jonathan never claimed that his mother prompted him to lie. Nevertheless, Jonathan's answers were confused and, in Dr. Robson's view, suggestive of possible coaching. Emphasizing these and other considerations, Robson's report gave a scathing critique of the SRS investigation, finding Adams' interviewing methods "particularly worrisome." Dr. Robson concluded that the reported abuse was unlikely.

After Dr. Robson filed his report with the Connecticut family court in January 1994, Wiegand disappeared with her children. Judge Barall proceeded with a hearing, awarding custody to Wilkinson and denying Wiegand visitation rights. In July 1996, Wiegand was arrested in Las Vegas, and both children were placed in Wilkinson's care.

## B. Procedural History

In June 1994, Wilkinson filed an action in Vermont state court against Dr. Balsam, Adams and Russell. Wilkinson's complaint charged that Russell's communications with the DCF (both the phone conversation and the subsequent letter to Shanley) constituted libel and slander. The complaint further charged the defendant social workers with several counts of negligence and with the intentional infliction of emotional distress, all relating to defendants' misconduct in substantiating the alleged abuse. Lastly, Wilkinson charged the defendant social workers with the deprivation of plaintiffs' civil rights without due process of law in violation of the Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983.[3]

Defendants removed this action to federal court and moved for summary judgment on several of plaintiffs' claims. On April 17, 1995, the trial court (Parker, *J.*) issued an opinion denying defendants' motions. Plaintiffs then filed an amended complaint,

on the same day, adding the SRS, Linda Wiegand, and Gerald Jeffords as defendants and Jonathan Wiegand as a plaintiff. On February 28, 1997, after the completion of discovery, defendants filed another motion for summary judgment. Judge Sessions, who had been assigned the case after Judge Parker's elevation to this Court, declined to rule on those counts already considered by Judge Parker in his April 17 ruling. Judge Sessions granted summary judgment against plaintiffs, however, on their libel and slander claims and on several claims of negligence *per se.* On March 31, 1998, plaintiffs proceeded to trial with their remaining claims.

On April 3, 1998, at the close of plaintiffs' case, defendants moved for judgment as a matter of law under Rule 50(a) of the Federal Rules of Civil Procedure. Judge Sessions granted defendants' motion, holding that defendants were entitled to qualified immunity as to all claims, and that the alleged misconduct was not, in any event, the proximate cause of plaintiffs' damages. This appeal followed.

## DISCUSSION

■■■■ This Court's standard of review is the same with respect to both the district court's grant of summary judgment and its decision granting defendants' motion for judgment as a matter of law. We review both orders *de novo,* giving the nonmoving party, plaintiffs in this case, the benefit of all reasonable inferences that the evidence permits. *See Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490, 494 (2d Cir.1995) (setting out standard of review of judgment as a matter of law); *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202–03 (2d Cir.1995) (setting out standard of review of grant of summary judgment). Under this standard, we affirm a district court's grant of summary judgment only if, viewing the evidence most favorably to the

---

3. Plaintiffs also advanced several claims against Dr. Balsam, including gross negligence and malpractice. Plaintiffs report that they reached a settlement with Dr. Balsam and that he was dismissed as a defendant in this action by stipulation entered on October 28, 1996.

plaintiffs, there are no genuine issues as to any material fact. *See Cronin,* 46 F.3d at 202–03. Likewise, we affirm a trial court's judgment as a matter of law only if, "without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *Indu Craft,* 47 F.3d at 494 (internal quotation marks omitted) (alteration in original).

■ In each of his decisions, Judge Sessions disposed of several of plaintiffs' claims on the basis of immunity. Judge Sessions applied absolute immunity to shield defendant Russell from liability in connection with plaintiffs' claims of libel and slander, and qualified immunity to shield all of the defendants from many of plaintiffs' remaining claims. Absolute immunity prevents claims for damages, no matter how extreme the alleged wrongdoing, against "all persons—governmental or otherwise—who [are] integral parts of the judicial process." *Briscoe v. LaHue,* 460 U.S. 325, 335, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983). The Supreme Court has explained the rationale for this absolute protection as follows:

> The ability of courts, under carefully developed procedures, to separate truth from falsity, and the importance of accurately resolving factual disputes in criminal (and civil) cases are such that those involved in judicial proceedings should be "given every encouragement to make a full disclosure of all pertinent information within their knowledge."

*Id.* (quoting *Imbler v. Pachtman,* 424 U.S. 409, 439, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (White, *J.,* concurring)). Although absolute immunity has traditionally been applied in favor of judges, prosecutors, and other judicial officers, this logic dictates that anyone, even non-judicial officers (*e.g.,* witnesses), must be assured complete protection to the extent that they are fulfilling functions "closely related to the judicial process." *Burns v. Reed,* 500 U.S. 478,

494, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991).

■ By contrast, qualified immunity affords a lesser degree of protection in a broader range of circumstances. Where federal claims are involved, "[q]ualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Zahra v. Town of Southold,* 48 F.3d 674, 686 (2d Cir.1995) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)); *see also Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996) ("A government employee sued in her individual capacity for damages arising out of her performance of discretionary functions is entitled to qualified immunity where it was objectively reasonable to believe that her acts did not violate clearly established federally protected rights."). Under this formulation, all government officials are protected from liability in connection with their official acts provided that "it is objectively reasonable for [them] to believe that [they are] acting within constitutional and statutory bounds." *Zahra,* 48 F.3d at 686 (quoting *Natale v. Town of Ridgefield,* 927 F.2d 101, 104–05 (2d Cir.1991)).

■ The Vermont Supreme Court has established a nearly identical qualified immunity standard applicable to state law claims. *See LaShay v. Department of Social & Rehabilitation Serv's,* 160 Vt. 60, 65, 625 A.2d 224 (1993) ("Qualified immunity ... protects lower-level officers, employees and agents '(1) acting during their employment and acting, or reasonably believing they are acting, within the scope of their authority; (2) acting in good faith; and (3) performing discretionary, as opposed to ministerial acts.' ... 'Good faith exists where an official's acts did not violate clearly established rights of which the official reasonably should have known.'") (internal citations omitted).

The only significant difference is that "[q]ualified immunity from a state law claim does not contain the 'statutory or constitutional rights' limitation because a state law claim is not so limited." *Murray v. White,* 155 Vt. 621, 630 n. 4, 587 A.2d 975 (1991); *see also Sabia v. Neville,* 165 Vt. 515, 521, 687 A.2d 469, 473 (1996) ("Of course, when we consider state tort liability, the 'clearly established law' is not limited to federal constitutional and statutory rights, but may include Vermont statutes, regulations and common law."). In other words, immunity does not shield a government employee from liability where he or she unreasonably violates a right clearly established under state law, whether statutory, constitutional, or common law (*e.g.,* tort law). *See id.*

### I. Libel/Slander

#### A. Absolute Immunity

■ In his July 31 decision, Judge Sessions ruled that defendant Russell was entitled to absolute immunity in connection with plaintiffs' claims of libel and slander arising out of Russell's phone call and subsequent letter to Shanley (of the Connecticut DCF). Because Judge Barall had directed Shanley to consult with the Vermont SRS regarding the Wilkinson children, Judge Sessions reasoned that Russell, upon being contacted by Shanley, was effectively under a "court order" to share information with the Connecticut DCF. On this basis, the trial court determined that Russell was entitled to absolute immunity from any claim of libel or slander relating to her decision to cooperate with the Connecticut authorities.

■ We do not agree that Russell was acting under a court order or that she is otherwise entitled to absolute immunity in connection with her two communications with Shanley. We begin with the presumption "that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their

duties." *Burns,* 500 U.S. at 486–87, 111 S.Ct. 1934; *see also Hill v. City of New York,* 45 F.3d 653, 660 (2d Cir.1995). This is a presumption that is not easily overcome; indeed, the Supreme Court has been "quite sparing" in its "recognition of absolute immunity." *Burns,* 500 U.S. at 486–87, 111 S.Ct. 1934. Thus, defendants are not entitled to absolute immunity unless they can demonstrate that such complete protection is "necessary to protect the judicial process." *Hill,* 45 F.3d at 660; *see also Scotto v. Almenas,* 143 F.3d 105, 110 (2d Cir.1998) ("Absolute immunity is proper only in those rare circumstances where the official is able to demonstrate that the application of absolute immunity to the circumstances presented is required by public policy.").

Defendants have not advanced any arguments sufficient to establish that Russell's communications with Shanley were so "closely related to the judicial process" that they warrant absolute protection. *See Burns,* 500 U.S. at 494, 111 S.Ct. 1934; *see also Imbler,* 424 U.S. at 430, 96 S.Ct. 984 (holding that absolute immunity extends only to those "intimately associated" with the judicial process). To the contrary, the Connecticut family court never consulted Russell directly or even through formal channels, but relied instead upon an intermediary tasked simply with uncovering "what's going on." *Wilkinson,* 973 F.Supp. at 439 n. 2. In our view, this kind of "order" is hardly in keeping with the "carefully developed procedures" that the Supreme Court has attempted to encourage through its sparing grants of absolute immunity. *See Briscoe,* 460 U.S. at 335, 103 S.Ct. 1108. Moreover, this communication between the court and the SRS was so unusual and attenuated that we simply do not see how a grant of absolute immunity under these circumstances is essential to the smooth operation of the judicial system.[4] Accordingly, a grant of absolute immunity is not justified.

---

**4.** The extent of this departure from ordinary procedure is highlighted by the fact that both

## B. Qualified Immunity

Although absolute immunity does not apply in the circumstances of this case, we agree with Judge Sessions' alternative holding that qualified immunity is sufficient to protect defendants from plaintiffs' claims of libel and slander. As a threshold matter, it is well settled that child protective services workers are entitled to qualified immunity for their conduct during the course of abuse investigations. *See, e.g., van Emrik v. Chemung County Dep't of Social Servs.,* 911 F.2d 863 (2d Cir.1990); *Murray,* 155 Vt. at 630, 587 A.2d 975. Under the Vermont qualified immunity standard, then, Russell is entitled to qualified immunity in her communications with Shanley unless Russell reasonably should have known that those communications violated clearly established law. *See Murray,* 155 Vt. at 630, 587 A.2d 975.

To prevail on a claim of libel or slander under Vermont law, a plaintiff must prove the following elements: "(1) a false and defamatory statement concerning another; (2) some negligence, or greater fault, in publishing the statement; (3) publication to at least one third person; (4) lack of privilege in the publication; (5) special damages, unless actionable *per se;* and (6) some actual harm so as to warrant compensatory damages." *Lent v. Huntoon,* 143 Vt. 539, 546–47, 470 A.2d 1162 (1983). We agree with defendants that it was objectively reasonable for Russell to believe that her conduct did not violate plaintiffs' rights, particularly with respect to the fourth element described by the court in *Lent.* Indeed, there is a widely recognized privilege from claims of defamation where information is disclosed pursuant to court order. *See* Restatement (Second) of Torts § 592A (1976) ("One who is required by law to publish defamatory matter is absolutely privileged to publish

it."); *see also Boice v. Unisys Corp.,* 50 F.3d 1145, 1149 (2d Cir.1995) (applying New York law "bestow[ing] an absolute privilege upon those whom the government compels to give evidence"). Although Russell was not technically responding to such an order, (*see* § I(A), *supra* ), it was at least reasonable for her to believe—as did the trial court below (and, apparently, the state attorney that advised Russell to write a letter to Shanley)—that Shanley's request on Judge Barall's behalf amounted to a court order. Therefore, Russell must be immunized in her decision to share information with a person who reasonably appeared authorized by a judge to obtain such information.

## II. Negligence *Per Se*

In his July 31, 1997 Order, Judge Sessions also disposed of four of plaintiffs' claims of negligence *per se,* each of which is now before the Court on appeal. In those jurisdictions in which negligence *per se* applies, the "violation of a duty imposed by statute for the benefit of a particular class 'is negligence itself.'" *See Chen v. United States,* 854 F.2d 622, 627 (2d Cir. 1988) (applying New York law). In a recent concurring opinion, Justice Dooley of the Vermont Supreme Court voiced his support for exactly this standard. *See Marzec–Gerrior v. D.C.P. Indus., Inc.,* 164 Vt. 569, 575–76, 674 A.2d 1248 (1995). In an extended discussion of state court precedent, however, he further found that the Vermont courts "have historically rejected the notion that violation of a safety statute is negligence *per se,*" and have instead veered between treating such a statutory violation as either a "disputable presumption" of negligence or as mere "evidence" of negligence. *Id.* at 572–75, 674 A.2d 1248 (citing cases). As a result, the relationship between a statutory violation and negligence is simply not clear under current Vermont state law. *Id.* For present

---

Connecticut and Vermont have adopted the Uniform Child Custody Jurisdiction Act ("UCCJA"), which is designed specifically to facilitate cooperation between jurisdictions in

child welfare matters. 15 Vt. Stat. Ann. § 1031, *et. seq.* (Supp.1998); Conn. Gen.Stat. § 46b–90, *et. seq.* (1995). These statutes were not followed in this case.

purposes, we need not resolve this confusion. Even assuming that negligence *per se* or some variation applies, qualified immunity shields defendants from liability unless they should reasonably have recognized that their alleged misconduct violated clearly established state statutory rights. *See LaShay*, 160 Vt. at 65, 625 A.2d 224. As explained below, the record does not support such a finding, and Judge Sessions was therefore correct in rejecting plaintiffs' claims.

### A. Failure to Investigate Possible Abuse of Nephew

■ Plaintiffs claim that defendants Adams and Jeffords committed negligence *per se* by failing to investigate a report that Wiegand had sexually abused her nephew. Plaintiffs maintain that defendants thereby violated their obligations under 33 Vt. Stat. Ann. § L4913(a), which directs that "any ... social worker ... who has reasonable cause to believe that any child has been abused or neglected shall report or cause a report to be made in accordance with the provisions of section 4914 of this title within 24 hours." On the undisputed facts of this case, however, it was not at all clear that defendants had "reasonable cause" to believe that Wiegand was guilty of abusing her nephew.

The Vermont State Attorney's Office notified Adams that Craig Martin, Wiegand's brother-in-law, had called a "hot-line" reporting that his child (Wiegand's nephew) had described possible sexual abuse by Wiegand. When Adams contacted Martin shortly thereafter, however, Martin insisted that his son had not in fact been abused. Martin further refused to permit Adams to conduct an interview with the child. There is simply no hint in any state law case that this withdrawn and second hand abuse allegation could have triggered a statutory obligation, under § 4913(a), for Adams to pursue matters further. Under these circumstances, Adams was under no clearly established obligation to file a report detailing the circumstances of any possible misconduct, and the lower court was correct that it was reasonable for defendants to believe that their decision did not violate § 4913(a).

### B. Failure to Conduct Interviews in Presence of Disinterested Adult

■ Plaintiffs also claim that defendant Adams committed negligence *per se* by interviewing Benjamin and Jonathan outside the presence of a disinterested adult, contrary to the requirements of the following provision of the Vermont Code:

> .... If the investigator elects to interview the child, that interview may take place without the approval of the child's parents, guardian or custodian, provided that it takes place in the presence of a disinterested adult who may be, but shall not be limited to being a teacher, a member of the clergy, or a nurse.

33 Vt. Stat. Ann. § 4915(b)(2). In other words, Vermont law authorizes a social worker investigating a claim of abuse to interview a possible child abuse victim outside of the presence of a disinterested adult only with the "approval of the child's parents, guardian or custodian." *Id.* Here, it is undisputed that Adams obtained permission to conduct his interviews only from Wiegand. It is also undisputed that Detective Merriam, the only adult other than Adams present during both child interviews, fails to qualify as a "disinterested adult" for purposes of § v4915(b)(2).[5] Thus, a determination as to whether Adams violated § 4915(b)(2) depends upon whether Wiegand's consent amounted to permission from the children's "parents."

Under Vermont's general rules of statutory construction, "words importing the plural number may be applied as if singular" unless a contrary intention appears

---

5. According to the SRS case worker manual, "[a] law enforcement officer is *not* a disinterested third party."

plainly within the terms of the statute. 1 Vt. Stat. Ann. § 175. Moreover, the Vermont Supreme Court has applied this rule of construction in circumstances similar to those now before us and, in particular, in the context of the child welfare provisions of the Vermont code. *See In re N.H.*, 135 Vt. 230, 235, 373 A.2d 851 (1977) ("It is an accepted rule of statutory construction that words used in the singular may be read as to include the plural, and the plural the singular, except where a contrary intention plainly appears.").

The *In re N.H.* court examined a state code provision that defines a child to be "in need of care" whenever that child has been "abandoned or abused by his *parents, guardian or other custodian.*" 33 Vt. Stat. Ann. § 632(a)(12) (emphasis added). The court interpreted this provision to permit a finding of need even where only *one* parent was guilty of abuse. *In re N.H.*, 135 Vt. at 234–35, 373 A.2d 851. Given this construction of the phrase "parents, guardian or other custodian"—the very phrase, in the very statutory scheme, presently at issue—it seems likely that the Vermont state courts (if confronted with the issue) would conclude that § 4915(b)(2) allows an interview, unattended by a disinterested adult, on the permission of only one "parent." We need not, however, decide the question since the *In re N.H.* decision demonstrates, at a minimum, that it was not "clearly established" under Vermont law that Adams needed permission from both Wilkinson and Wiegand to proceed with the child interviews. Qualified immunity therefore applies to shield defendants from liability in connection with their alleged violation of § 4915(b)(2). *Cf. Cook v. Nelson*, 712 A.2d 382, 386 (Vt.1998) (extending immunity where "[t]he criminal statute is subject to differing interpretations and has never been construed by this Court or the trial courts").

C. Failure to Investigate Alleged Coaching

 Plaintiffs' third claim of negligence *per se* is based on the allegation that defendants Russell, Adams and Jeffords violated Vermont law by failing to report and investigate the possibility that Wiegand was herself guilty of abusing both Benjamin and Jonathan. Plaintiffs contend that Wiegand's alleged coaching, in and of itself, amounted to mental abuse. Because there was "reasonable cause" to suspect such coaching, plaintiffs argue that defendants failed to meet their statutory obligation to report and investigate Wiegand's possible misconduct. *See* 33 Vt. Stat. Ann. §§ 4913–14 (requiring case workers to report and investigate where there is reasonable cause to suspect abuse).

Under Vermont law, an "abused or neglected child" is a child whose "physical health, psychological growth and development or welfare is harmed or is at substantial risk of harm by the acts or omissions of his or her parent or other person responsible for the child's welfare. An 'abused or neglected child' also means a child who is sexually abused or at substantial risk of sexual abuse by any person." 33 Vt. Stat. Ann. § 4912(a) (Supp.1998). It is certainly possible that the Vermont courts will determine that under certain circumstances, coaching can qualify as abuse. Indeed, we find it difficult to reject out of hand, as the district court seemingly did, the argument that it might be abusive for a mother to encourage a four year old to claim falsely, and in exceedingly graphic detail, that his father repeatedly forced him to engage in assorted sexual acts. Nevertheless, our research has not revealed, and plaintiffs have not identified, a single published opinion even evaluating coaching as a potential form of abuse. Therefore, while it is possible that the state courts will ultimately equate certain forms of coaching with abuse, this possibility was certainly not so "clearly established" at the time of the events now in question as to deprive defendants of qualified immunity. *See LaShay*, 160 Vt. at 65, 625 A.2d 224.

### D. Disclosure to the Connecticut Investigator

 Relying on the same factual allegations underlying their libel and slander claims, plaintiffs charge that Russell committed negligence *per se* by alerting Shanley to the results of the SRS investigation in violation of the following provision of the Vermont code:

> Written records maintained in the registry shall only be disclosed to the commissioner or person designated by the commissioner to receive such records, persons assigned by the commissioner to investigate reports, the person reported on, or a state's attorney. In no event shall records be made available for employment purposes, for credit purposes, or to a law enforcement agency other than the state's attorney ...

33 Vt. Stat. Ann. § 4916(d).

Although § 4916(d) purports to limit disclosure only to certain delineated individuals, and only under certain limited circumstances, the Vermont state courts have determined that this rule is "riddled with exceptions." *In re F.E.F. v. Cameron*, 156 Vt. 503, 514, 594 A.2d 897 (1991). In *In re F.E.F.*, for example, the Vermont Supreme Court held that the confidentiality provisions governing substantiation must give way when information is requested pursuant to a court order. *Id.* Although we have held today that Shanley's request to Russell was not a court order, we have also held that it was reasonable for Russell to perceive it as such at the time of these events (*see* § I(B), *supra*). Thus, it was likewise reasonable for Russell to believe that in these unusual circumstances, her communications with Shanley did not contravene the clear requirements of § 4916(d).

### III. Judgment as a Matter of Law

In his April 3, 1998 decision granting defendants' Rule 50(a) motion for judgment as a matter of law, Judge Sessions extended qualified immunity to the defendant case workers after finding that the "actions of these defendants were *objectively reasonable* ... and no rational juror could conclude otherwise." Plaintiffs dispute this holding. They argue that the evidence at trial revealed numerous errors in the abuse investigation. Plaintiffs emphasize that defendants substantiated the allegations against Wilkinson largely on the basis of two deeply flawed child interviews. Plaintiffs also note the absence of physical evidence of abuse and the significant evidence of possible maternal coaching. Finally, plaintiffs complain that defendants failed to interview Wilkinson, and that they mistakenly deferred to the opinion of a therapist acting as Wiegand's advocate. In light of these problems, plaintiffs contend that defendants' conduct ran afoul of clearly established standards in their profession and, therefore, defendants are not entitled to qualified immunity.[6] (Brief of Appellants at 32–39.)

### A. Federal Claims

 "A court evaluating a claim of qualified immunity 'must first determine

---

**6.** For purposes of this discussion, we accept *arguendo* plaintiffs' claim that Wilkinson was in fact separated from his children as a result of the SRS substantiation determination. In its April 3, 1998 ruling, the district court rejected this theory, finding that defendants' alleged misconduct was not the proximate cause of plaintiffs' harm. Although we do not fully explore this issue, we have serious doubts as to the lower court's conclusion. Plaintiffs argue persuasively that the evidence, when viewed in their favor, "demonstrated that Adams and Merriam worked jointly as a team, collaborated in their investigation and shared information with the State's Attorney." (Appellants' Brief at 41.) Moreover, it seems at least plausible that a case worker would recognize that his or her errors in conducting a child interview might reasonably play a significant role in a subsequent determination by the participating police officer as to whether to initiate an abuse prosecution. Nevertheless, we stop short of a definitive ruling on this point because its resolution is not essential to our ultimate holding that plaintiffs have failed to present evidence sufficient to demonstrate a constitutional violation.

whether the plaintiff has alleged the deprivation of an actual constitutional right at all.'"[7] *Wilson v. Layne,* —— U.S. ——, 119 S.Ct. 1692, 1697, 143 L.Ed.2d 818 (1999) (quoting *Conn v. Gabbert,* —— U.S. ——, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999)). In the event that this threshold determination reveals a possible constitutional violation, " '[a] qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law.'" *Tierney v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998) (quoting *Salim v. Proulx,* 93 F.3d 86, 89 (2d Cir.1996)). This immunity determination, in turn, depends largely on whether the law was defined "with reasonable clarity" at the time of the disputed events and on whether a reasonable defendant would have "understood from the existing law that the conduct was unlawful." *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998).

"[T]he objective reasonableness standard was designed to facilitate resolution of the [qualified immunity] defense" as a matter of law. *See Warren v. Dwyer,* 906 F.2d 70, 74 (2d Cir.), *cert. denied,* 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990); *see also Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (stressing "the importance of resolving immunity questions at the earliest possible stage in litigation"). This is reflected in the fact that whether a defendant reasonably should recognize that he or she is

acting illegally often depends on the extent to which courts have been precise in defining the scope of a particular right as of a particular point in time. That, of course, is a legal determination. Thus, although "[d]isputes over reasonableness are usually fact questions for juries," this Court has recognized that "when 'the factual record is not in serious dispute,'" the ultimate determination as to whether a defendant should have recognized that he or she violated a plaintiff's clearly established rights " 'is a question of law better left for the court to decide.'" *Lennon v. Miller,* 66 F.3d 416, 421 (2d Cir.1995) (reversing denial of summary judgment and extending qualified immunity on behalf of police officers sued for false arrest, malicious prosecution and excessive force) (quoting *Warren,* 906 F.2d at 76); *see also Tierney,* 133 F.3d at 194 (holding that "when the facts that bear on the circumstances are not in dispute, the issue of whether the defendants acted reasonably should be determined by the court on a motion for summary judgment").

## 1. Alleged Constitutional Violation

■ In support of their federal claims, plaintiffs invoke their "right to the integrity of their familial relationships." (Appellants' Brief at 47.) It has long been settled in this Circuit "that a parent's interest in the custody of a child [is] a constitutionally protected liberty interest subject to due process protection." *Cecere v. City of New York,* 967 F.2d 826, 829 (2d Cir.1992); *see also Gottlieb,* 84 F.3d at 518 ("It is

---

7. Prior to its decision in *Wilson,* the Supreme Court had merely "recommend[ed]" that courts pass on the underlying constitutional merits before deciding whether to extend qualified immunity.. *See Powell v. Schriver,* 175 F.3d 107, 110 (2d Cir.1999) (citing *County of Sacramento v. Lewis,* 523 U.S. 833, ——, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998)). In an opinion issued just days before *Wilson* was decided, a majority panel of this Court characterized that recommendation as *dicta* to be followed only in some circumstances. *Horne v. Coughlin,* 178 F.3d 603 (2d Cir.1999). The *Horne* majority specifically suggested that the lower federal

courts reach the constitutional merits only where there is a "danger of sustained uncertainty" in the law. *Id.* at 606. It is not clear whether *Wilson,* with its seemingly mandatory language, permits such a limitation. We need not resolve this issue here, however. Even under the majority view in *Horne,* we consider this an appropriate case in which to decide the constitutional issue before us. For reasons set out in Section IIIA2, *infra,* the extent of a parent's constitutional protection in the abuse investigation context has been the subject of considerable uncertainty and confusion.

established that parents have a fundamental, constitutionally protected liberty interest in the custody of their children."). In addition, nearly thirty years ago, the Supreme Court recognized that "[t]he integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment ... the Equal Protection Clause of the Fourteenth Amendment ... and the Ninth Amendment." *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (citations omitted); *see also Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ("The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents...."). Moreover, the Vermont Supreme Court recognized this constitutional right to family integrity many years before defendant Adams ever commenced his allegedly faulty investigation. *See In re N.H.*, 135 Vt. at 236, 373 A.2d 851 ("[T]he freedom of children and parents to relate to one another in the context of the family, free of governmental interference, is a basic liberty long established in our constitutional law.").[8]

Although parents enjoy a constitutionally protected interest in their family integrity, this interest is counterbalanced by the " 'compelling governmental interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parents themselves.' " *Manzano v. South Dakota Dep't of Social Servs.*, 60 F.3d 505, 510 (8th Cir.1995) (quoting *Myers v. Morris*, 810 F.2d 1437, 1462 (8th Cir.1987), *overruled on other grounds by Burns v. Reed*, 500 U.S. 478, 111 S.Ct. 1934, 114 L.Ed.2d 547 (1991)). This competing interest, though compelling, is not so compelling as to derogate a parent's constitutional rights completely. Case workers cannot be free to substantiate a claim of abuse, for instance, by ignoring overwhelming exculpatory information or by manufacturing false evidence. *Cf. Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 130 (2d Cir.1997) (finding triable issue on whether officers were entitled to immunity from claim that they violated suspect's "clearly established Constitutional rights by conspiring to fabricate and forward to prosecutors a known false confession"). The difficulty of balancing the weighty interests apparent in the abuse context, however, has prompted courts to impose few concrete restrictions on case workers, in exercising their discretion, short of these obvious extremes.

 This Circuit has adopted a standard governing case workers which reflects the recognized need for unusual deference in the abuse investigation context. An investigation passes constitutional muster provided simply that case workers have a "reasonable basis" for their findings of abuse. *Van Emrik*, 911 F.2d at 866. Other circuits have adopted a

---

8. We do not read the Vermont Supreme Court decision in *Billado v. Appel*, 165 Vt. 482, 687 A.2d 84 (1996)—rendered after the events now in question—to signal a rejection of this established law. In *Billado*, the court affirmed a decision extending qualified immunity on behalf of the defendant SRS case workers in connection with an abuse investigation. In characterizing relevant precedent, the Court noted that "[a]lmost without exception, courts have found such actions to be protected by qualified immunity because there is no controlling constitutional right of family integrity or because the right is so amorphous and conditional that no worker could know that his or her actions were in violation of the right." *Id.* at 89. We interpret this merely to reflect the Vermont Supreme Court's view that although the constitution extends certain rights pertaining to the family, precedent has not delineated the exact parameters of those rights and case workers have therefore seldom had a basis for concluding that their actions were unconstitutional. This is generally in keeping with our view, set out in § IIIA2, *infra*. Moreover, to whatever extent the *Billado* court intended to go further and to call into doubt the very existence of a constitutional right to family integrity, we simply cannot agree. Despite a smattering of contrary decisions, overwhelming authority has long confirmed that such a right exists.

similarly deferential standard. *See, e.g., Thomason v. SCAN Volunteer Servs. Inc.,* 85 F.3d 1365, 1371 (8th Cir.1996) (requiring a "reasonable suspicion" of abuse). In applying a reasonableness standard in the abuse context, courts must be especially sensitive to the pressurized circumstances routinely confronting case workers, circumstances in which decisions between "difficult alternatives" often need to be made on the basis of limited or conflicting information. *See van Emrik,* 911 F.2d at 866.

In light of these considerations, we find it significant that we are not dealing with a situation in which the evidence should have suggested to Adams, unequivocally, that Benjamin and Jonathan had been coached rather than abused. The transcript of Benjamin's interview, for instance, reveals that the child at times claimed that he had been coached by his mother, but at other times maintained that his allegations were true. (Tr. at 10–11 (Q: "Did somebody tell you to say that or did it really happen?" A: "It really happened"); Tr. at 5 (Q: "I need you to tell me if you're making up these stories or if they're the truth. . . . Which is it? The real stuff or makeup stuff?" A: "The real stuff.").) Moreover, plaintiffs presented no evidence that Jonathan ever explicitly claimed that he was coached. The most that can be inferred from the Robson report, upon which plaintiffs depend, is that Jonathan's responses in this area were "uncertain." (Trial Ex. 74 at 24.) The evidence thus suggests that the children gave conflicting signals as to whether their father had abused them.

In his report, Dr. Robson, perhaps plaintiffs' primary witness, identified a number of additional factors that he conceded "appear[ed] to support the credibility of the allegations of sexual abuse against the minor children by Thomas Wilkinson." (Trial Ex. 74 at 76.) For example, the children's allegations were "specific and consistent," their drawings were "explicit," and their allegations were at least "apparently" spontaneous. (*Id.* at 76–77.) Although Dr. Robson determined that such considerations were outweighed by countervailing evidence of coaching and fabrication (evidence that he collected and analyzed over the course of five months), the fact remains that he was able to identify a number of significant considerations providing defendants with a basis to conclude that Wilkinson was guilty of abuse.

The record reveals another key source of information supporting defendants' decision to substantiate Wiegand's abuse allegations. Throughout this litigation, and particularly during the time that Dr. Balsam remained a defendant, plaintiffs emphasized the doctor's role in encouraging the SRS to substantiate the claimed abuse. According to plaintiffs, Balsam contacted SRS officials directly and repeatedly to accuse Wilkinson and to refute any possibility of coaching by Wiegand. In light of these communications with a trained psychiatrist, Adams was left with a seemingly credible indication, beyond his interpretation of the children's statements, that Wilkinson was guilty.[9] *Cf. Thomason,* 85 F.3d at 1373 ("Where a treating physician has clearly expressed his or her reasonable suspicion that life-threatening abuse is oc-

---

9. In an argument echoed by Judge Calabresi in his concurring opinion, plaintiffs contend that defendants were unreasonable to rely on Dr. Balsam's representations specifically because the doctor served as Wiegand's hired therapist. Although there may well be circumstances in which a therapist is so obviously conflicted that it would give rise to possible liability for a case worker to defer to that therapist's judgment, we do not believe that this is that case. As noted above, defendants did not rely exclusively on Balsam's profes-

sional judgment. Moreover, we see nothing in the record to suggest that Wiegand and Balsam, in a mere two visits, had established a significant clinical relationship as of the time that Balsam contacted defendants to express his views concerning the alleged abuse. Of at least equal importance, there is nothing in the record to suggest that defendants had any basis for suspecting the existence of such a conflicted relationship if indeed there was one.

curring in the home, the interest of the child ... in being removed from that home setting to a safe and neutral environment outweighs the parents' private interest in familial integrity as a matter of law.").

In short, between the children's equivocal statements, the assorted other considerations identified by plaintiffs' own expert, and the repeated communications from Balsam, defendants were left to make exactly the kind of "difficult" decision that goes to the heart of our reasonable basis standard. *Van Emrik,* 911 F.2d at 866. This is not to say that we approve of the SRS investigation, or agree with the conclusions that were reached. In fact, it appears that Adams should have been considerably more thorough in his work. Benjamin, by his express claims of coaching by his mother, raised significant doubt as to the likelihood of abuse, and that doubt was compounded by the absence of any medical evidence (particularly given the invasive types of physical abuse that Benjamin described). Nevertheless, Adams interviewed Benjamin only once, used leading questions, and did not fully explore the child's comments suggesting possible maternal coaching. Furthermore, instead of seeking corroboration from additional witnesses, or from an independent psychiatrist or from elsewhere, Adams spoke only to Balsam, a child psychiatrist who had met with the children only two or three times.

 Despite these assorted problems, we conclude that defendants had a reasonable basis for their substantiation determination and that they therefore did not violate plaintiffs' constitutional rights. As we have emphasized, courts must apply the "reasonable basis" test to permit investigators considerable discretion in the abuse context. This is in keeping with the basic precept that a mere failure to meet local or professional standards, without more, should not generally be elevated to the status of constitutional violation. *Cf. Young,* 160 F.3d at 902 ("The procedure mandated by state family law is not the benchmark for evaluating whether or not there has been a federal constitutional violation."). As a result, even a faulty investigation does not necessarily rise to the level of an unconstitutional investigation. *See van Emrik,* 911 F.2d at 866 (acknowledging that defendant caseworkers should have been "more candid" in explaining the results of their investigation to a family court judge assigned to a make a custody determination, but holding that this omission "did not rise to the level of a constitutional violation"); *see also Manzano,* 60 F.3d at 513 ("Although the record reveals an [abuse] interrogation which appears far from textbook perfect, the record of the investigation ... does not demonstrate conduct so outrageous that it offends the substantive component of the Due Process Clause."). This is a case in point; even with its deficiencies, the SRS investigation generated significant information supporting a finding of abuse. In our view, this evidence was sufficient—though marginally—to establish the requisite reasonable basis for defendants' substantiation determination to comport with plaintiffs' constitutional right to family integrity.

## 2. Qualified Immunity

At the outset of our discussion, we noted the Supreme Court's recent pronouncement that courts "must" reach the constitutional merits before addressing an immunity defense. *See Wilson,* 119 S.Ct. at 1697. In this case, that guidance makes particularly good sense. Parents complaining that a faulty abuse investigation has prompted a state court to separate them from their children are often barred either by the *Rooker–Feldman* or *Younger* abstention doctrines from pursuing injunctive relief in a federal action. *See, e.g., Martinez v. Scoppetta,* 1997 WL 316714 (S.D.N.Y. June 10, 1997) (applying the *Younger* doctrine to dismiss parents' claims for injunctive relief arising out of an allegedly faulty abuse investigation); *Duby v. Moran,* 901 F.Supp. 215 (S.D.W.Va. 1995) (applying the *Rooker–Feldman* doc-

trine to deny jurisdiction over injunctive action by a mother seeking custody of a child removed from her in a state court proceeding); *Renn v. Garrison*, 845 F.Supp. 1127 (E.D.N.C.1994) (applying the *Younger* doctrine to deny jurisdiction over action by parents seeking to enjoin ongoing abuse investigation). As a result, there have been few if any cases in which courts have considered a constitutional challenge to the adequacy of an abuse investigation unaccompanied by an immunity defense. Rather than separating the constitutional test from the immunity test in the cases that have arisen, courts have simply conflated the two and have routinely extended immunity even in instances of apparent serious abuse by case workers.[10] As an unfortunate consequence, defendants have been immunized in connection with an ever expanding range of misconduct since so little has ever been deemed either clearly "constitutional or non-constitutional." *County of Sacramento*, 118 S.Ct. at 1714 n. 5.

By taking this opportunity to address constitutionality in advance of immunity, we have begun the difficult process of identifying particular conduct falling inside and outside of acceptable constitutional parameters. In this way, and at the Supreme Court's urging, we hope to "promote[ ] clarity in the legal standards for official conduct." *Wilson*, 119 S.Ct. at 1697. Indeed, from this day forward, these and other case workers should understand that the decision to substantiate an allegation of child abuse on the basis of an investigation similar to but even slightly

more flawed than this one will generate a real risk of legal sanction.

For the reasons explained, however, past cases have been significantly more permissive. Indeed, there were numerous cases predating this one that would have left defendants with little or no indication that their alleged misconduct, as near as it was to the constitutional borderline, would have even implicated serious constitutional concerns. *See, e.g., Stem v. Ahearn*, 908 F.2d 1, 2–3, 6–7 (5th Cir.1990), *cert. denied*, 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991); *Frazier v. Bailey*, 957 F.2d 920, 923–26, 931 (1st Cir.1992). Although our finding on the constitutional merits is sufficient to resolve this case, we therefore consider it useful to undertake a qualified immunity style analysis demonstrating the extent to which there has been an absence of "clearly established law" in this area. By analyzing a number of past cases, it becomes readily apparent that however marginal defendants' conduct was under the constitutional standard that we apply today, it was at least objectively reasonable for defendants to believe that their conduct was not inconsistent with plaintiffs' clearly established rights.

In *Frazier*, the First Circuit upheld a grant of qualified immunity on behalf of case workers in circumstances strikingly similar to those before us. As in this case, the abuse allegations in *Frazier* grew out of a "bitter ... custody battle" between the plaintiff father and his estranged wife, the mother of the alleged child victim. *Frazier*, 957 F.2d at 923. The mother in

---

**10.** These courts have not neglected to separate the constitutional analysis from the immunity analysis; they have expressly found it "nearly impossible" to do so. *See Manzano*, 60 F.3d at 510; *see also Thomason*, 85 F.3d at 1371 (citing *Manzano*). We can certainly appreciate this frustration. Indeed, constitutionality in this area depends on whether there was a reasonable basis for a finding of abuse, whereas immunity of course depends on a reasonableness determination as well. There is thus an undeniably close relationship between these two standards, and it is at least difficult to untangle one from the other. Nev-

ertheless, we believe that there is a difference between finding a "reasonable basis" for an abuse determination and evaluating whether it was objectively reasonable for a case worker to believe that such a basis existed. The former depends on the facts and events of a particular case, whereas the latter depends on the clarity of existing law at the time of those events. Though subtle, this distinction is significant. The Supreme Court has counseled that unless courts fully address the facts of particular cases, constitutional standards will never be clearly developed. *See County of Sacramento*, 118 S.Ct. at 1714 n. 5.

*Frazier* first claimed possible sexual abuse during a visit with one of her children to a family physician. *Id.* Two state agencies subsequently investigated the matter, each of which allegedly made significant errors in substantiating the abuse claims against the plaintiff. The Massachusetts Department of Social Services ("DSS"), for example, found "reasonable cause" to conclude that the plaintiff was guilty of the alleged sexual abuse while ignoring a physician's report of child neglect by the mother. *Id.* at 923. A case worker with the Children's Aid and Family Service of Hampshire County (CAFS) also allegedly "coached and programmed" the child to make false allegations of sexual abuse against her father. *Id.* at 924. Nevertheless, the First Circuit held that immunity shielded the defendant case workers from liability. In reaching its conclusion, the *Frazier* court emphasized the murky nature of parental rights: "Because the right to family integrity has not been so particularized as to put defendants on notice that their conduct was unlawful, [the defendants] are entitled to qualified immunity as a matter of law." *Id.* at 931.

The *Stem* case, like this one (and like *Frazier*), involved abuse allegations leveled against the plaintiff father by his estranged wife during the course of an "acrimonious child-custody dispute." *Stem*, 908 F.2d at 2. Also as in this case, the defendant case workers concluded that the plaintiff father was guilty of abuse "despite medical evidence to the contrary," and without interviewing the father. *Id.* at 2–3. The Fifth Circuit held that even accepting these allegations as true, the plaintiff's request for a hearing (which was provided in this case) was "completely devoid of merit." *Id.* at 6. Although recognizing that the Constitution extends "certain fundamental parental rights," the court held that plaintiff's allegations did not even "implicate the constitutional guarantees at issue." *See id.*

The decisions in *Frazier* and *Stem*, both issued before the events now under consid-

eration, are representative of decisions rendered before and since by numerous federal courts, including this one. *See, e.g., van Emrik*, 911 F.2d at 866 (upholding grant of qualified immunity in favor of protective services case workers charged, among other things, with failing to alert family court judge about information potentially exculpatory as to the defendant parents); *Manzano*, 60 F.3d at 511 (upholding grant of qualified immunity where "investigator concluded that the child was molested despite the lack of medical corroboration [and] the investigator reached this conclusion without interviewing the father"); *Thomason*, 85 F.3d at 1372 ("[W]hile we recognize that plaintiffs are justified in feeling that more background investigation could have been done and that [a defendant case worker] handled the initial encounter with Thomason in an unprofessional manner, we hold that plaintiffs' constitutional rights were not violated as a result of the removal of [the child] from their home."). This precedent demonstrates that courts have routinely granted qualified immunity, as a matter of law, even when plaintiffs have alleged the very types of investigative deficiencies now at issue, *e.g.*, where case workers failed to pursue exculpatory information, ignored medical evidence, behaved "unprofessional[ly]," or even manipulated interviews. Moreover, as explained, few if any of these opinions provide any clear guidance as to the degree of investigative deficiencies that might rise to a level of constitutional concern.

██ In sum, we have attempted today to make clear that the reasonable basis test places certain constitutional limitations on case workers, *i.e.*, their decisions to declare claims of abuse substantiated must be consistent with some significant portion of the evidence before them. Moreover, we have analyzed the particular allegations before us against this standard and have found that defendants did have a reasonable basis, though only marginally, to reach the conclusions that they did.

Before today, however, courts had excused a broad array of alleged investigative errors without even hinting at the particular circumstances in which such errors might amount to a constitutional violation. Accordingly, at the time of their investigation, defendants were left with little or no basis to conclude that their alleged misconduct could even potentially intrude upon plaintiffs' constitutional rights. Thus, while we make a close call in holding that there was no constitutional violation on the record before us, it is abundantly clear that it was objectively reasonable for defendants, in light of prior case law, to conclude that their investigation, however flawed, was consistent with plaintiffs' "clearly established" rights.

## B. State Claims

 We agree with defendants that the Vermont Supreme Court decision in *Murray,* rendered two years prior to the events now in question, provides compelling authority requiring the dismissal of plaintiffs' state law claims. As in this case, the *Murray* court considered a complaint in which plaintiffs essentially charged that the defendant case worker "did not conduct a sufficiently thorough investigation ... and that the investigation that she did do was conducted in a manipulative manner." *Murray,* 155 Vt. at 628, 587 A.2d 975. Moreover, the court in *Murray* immunized the defendant SRS case workers from some of the same state law claims presently at issue.

In *Murray,* a mother complained that her neighbor, the plaintiff, had molested her two daughters. Despite knowing that the girls' family included and had associated with "alleged and convicted sexual molesters," the defendant SRS case worker conducted an investigation that "did not go beyond interviewing the family, taking taped statements from the two alleged victims, and learning that plaintiff was a convicted murderer." *Id.* at 628–29, 587 A.2d 975. In addition, the court accepted the plaintiffs' factual allegations that the defendant asked leading questions during the child interviews and even "corrected" one of the girl's memories during a break in questioning. *Id.* at 629, 587 A.2d 975. Despite all of this, the court could identify "no clearly established law ... which should have made it known to defendant that her acts violated plaintiffs' rights." *Id.* at 631, 587 A.2d 975.

In light of *Murray,* we cannot find that Vermont law clearly required a more thorough investigation than defendants in fact conducted. The factual similarities are simply too pervasive. For instance, plaintiffs complain that defendants violated settled standards in their profession by failing to interview Wilkinson before substantiating a claim of sexual abuse against him; in *Murray,* however, the accused molester also was not interviewed in advance of substantiation. *Id.* at 623–24, 587 A.2d 975. Likewise, plaintiffs complain that defendants failed to investigate possible abuse by Wiegand; in *Murray,* however, investigators similarly ignored allegations made against members of the children's family. *Id.* at 628–29, 587 A.2d 975. Also, plaintiffs contend that defendant Adams prompted the children to claim abuse during their initial interviews; in *Murray,* however, the court credited similar allegations that the defendants posed "leading questions" and even "correct[ed]" answers. *Id.* Nevertheless, the Vermont Supreme Court determined that "[t]he law surrounding the taking of statements from suspected minor sexual abuse victims" was not so clearly established as to permit liability. *Id.* at 632, 587 A.2d 975.[11]

---

11. Plaintiffs attempt to distinguish *Murray* on the basis that whatever the factual allegations in that case, the Court was able to conclude that the defendant case workers complied with the following Vermont statutory requirements for abuse investigations:

(a) The commissioner ... shall cause an investigation to commence within seventy-two hours after receipt of a report ...

(b) The investigation, to the extent that it is reasonable, shall include:

In sum, the Vermont Supreme Court decision in *Murray* provided defendants with a reasonable basis to believe that their abuse investigation was consistent with plaintiffs' rights under state law at the time of their alleged misconduct. The district court was therefore correct that defendants are entitled to state qualified immunity.

## CONCLUSION

For the reasons set forth above, we AFFIRM the judgment of the district court dismissing this action in its entirety.

CALABRESI, Circuit Judge, concurring:

I concur in the result reached by the majority in this sad and difficult case and join in the court's opinion in all respects except for Part III.A.1. I write separately because I am troubled by the court's holding that we can, as a matter of law, say that Thomas Wilkinson's constitutional rights were not violated by the SRS investigation. Since, however, the unreasonableness of a probe like the one conducted in this case was not clearly established when Wilkinson was falsely labeled a child abuser and deprived of his children, qualified immunity applies and suffices to support the court's judgment.

> (1) A visit to the child's place of residence or place of custody and to the location of the alleged abuse or neglect;
> (2) An interview with, or observance of the child reportedly having been abused or neglected . . .

33 Vt. Stat. Ann. § 4915. In light of this provision, it was significant to the *Murray* Court that defendants commenced their investigation within 72 hours of the initial report of abuse, that defendants conducted interviews with the alleged victims, and that defendants visited the home where the alleged abuse took place. *See Murray*, 155 Vt. at 631–32, 587 A.2d 975. Here too, however, plaintiffs commenced their investigation almost immediately upon receiving a report and conducted interviews with each of the children involved. Also, though defendants never visited Wiegand's home, § 4915 requires that investiga-

I

Relying on a line of recent Supreme Court decisions that stem from Footnote Five of *County of Sacramento v. Lewis*, 523 U.S. 833, —— 118 S.Ct. 1708, 1714 n. 5 (1998), *see Wilson v. Layne*, —— U.S. ——, ——, 119 S.Ct. 1692, 1696, 143 L.Ed.2d 818 (1999); *Conn v. Gabbert*, —— U.S. ——, ——, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999), the majority argues that it is appropriate to separate the discussion of whether Wilkinson's rights were violated from the question of whether those rights, even if infringed, were clearly established at the time the SRS investigation occurred. *Ante* at 107 n. 10. To accomplish this feat, the majority necessarily engages in a "dual reasonableness" analysis and considers first whether the conduct of the SRS officials was so unreasonable that it violated Wilkinson's parental rights, and then whether, even if Wilkinson's rights were infringed, the SRS officials could reasonably believe that they were not violating his rights and therefore still benefit from qualified immunity. I am skeptical that reasonableness can remain a coherent standard when it is piled layer upon layer in this fashion. On the other hand, I do believe that the majority's effort to identify when a child abuse investigation goes beyond the constitutional pale is admirable, and so I would be inclined to adopt the majority's framework despite my doubts

tors take this step only "to the extent that it is reasonable" to do so. Here, there was at least a reasonable basis for Adams to conclude that it was not. According to both Adams's and Merriam's undisputed testimony, Merriam contacted Adams with updates concerning his investigation into the alleged abuse. As part of that investigation, Merriam personally visited Wiegand's home and was able to confirm for Adams that the layout "checked out" with the boys' accounts. (4/1/98 Trial Tr. at 151, testimony by James Adams.) In any event, given the overwhelming similarities in the scope of the two investigations, *Murray* cannot fairly be distinguished on the grounds that the investigation in that case was plainly consistent with statutory requirements while the investigation here plainly ran afoul of those requirements.

as to whether this kind of analysis can be pulled off successfully.

My reason for not joining the majority's opinion derives instead from a different uncertainty, one based on the facts of the case. If I read the facts the way the majority does, I would probably join in its conclusion that Wilkinson's parental rights were not violated. The majority asserts that the "evidence was sufficient—though marginally—to establish the requisite reasonable basis for defendants' substantiation determination to comport with plaintiffs' constitutional right to family integrity." *Ante* at 106. While conceding that Adams "should have been considerably more thorough in his work" and that he conducted the interviews with the children in an unprofessional manner, the majority believes that Adams reasonably relied on Dr. Balsam's emphatic statements that Wilkinson had abused the children. *See ante* at 105. Adams reasonably treated Dr. Balsam as fully credible, the majority states, despite the doctor's relationship with Linda Wiegand—the children's mother and Wilkinson's estranged wife—since that relationship was too attenuated to matter. The majority adds that, in any event, the defendants had no basis "for suspecting the existence of such a conflicted relationship." *See ante* at 105 & n. 9.

I believe that these statements rely on factual premises that are not clear enough to justify the district court's grant of a Rule 50(a) judgment for the defendants (if that judgment is to be grounded not on qualified immunity, but on the notion that there was no violation of Wilkinson's constitutional rights). The evidence that the SRS credited to substantiate Wilkinson as a child abuser was admittedly flimsy. All that the defendants had were (1) Wie-

gand's allegations, (2) the seriously flawed interview of the children, and (3) Dr. Balsam's assertions. It may well be, as the majority argues, that Adams should not have questioned Dr. Balsam's judgment about who was abusing the children simply because Dr. Balsam had seen Wiegand professionally on some occasions. On the other hand, the record indicates (1) that Adams was aware—before the substantiation decision was made—that Dr. Balsam *had* seen Wiegand professionally,[1] and (2) that Adams failed to inquire into the extent of that relationship and the possible conflict that it might present for Dr. Balsam. Given the terrible consequences that flow from depriving a parent of his or her child, I believe that once a social worker knows that a crucial source of information in the investigation has a potential conflict, it is unreasonable for the worker to disregard that conflict without inquiry.[2]

The majority does not read the facts that way. Essentially, it says that when a child abuse investigation (1) instigated by a parent (2) unearths ambiguous statements made by children—during a negligently conducted interview—suggesting that they may have been horrendously abused, and (3) these charges are supported by reports from a doctor who had seen the children, but whom the social workers knew had also had what they believed was a minor professional relationship with the complaining parent, then the decision of the investigators to declare the other parent a sexual abuser does not violate that parent's rights. But the majority does not adequately consider the possibility that a jury could properly find on the evidence in this case that the relationship between the reporting physician and the complaining parent was either sufficiently strong to make a reasonable social worker skeptical of the doctor's opinions, or, at

1. There are also indications that the SRS worker who took Wiegand's initial complaint knew of Dr. Balsam's dual role.

2. Of course, there may well be cases in which there is enough evidence—independent of the potentially conflicted source—to support the

substantiation decision. But that is not so here. Without Dr. Balsam's statements that Wilkinson was the abuser, it seems clear that SRS would not have had enough evidence to declare the charges substantiated.

least, to mandate further inquiry into that relationship. I believe instead that the reasonableness of Adams' reliance on the doctor's conclusion was, on the facts before us, a jury question (or would have been but for the existence of qualified immunity).

## II

The majority does state, and powerfully, that even a little less evidence would lead to the conclusion that Wilkinson's rights were violated. With that statement I fully concur. There is, however, another consideration that has so far gone unmentioned in this regard. The discussion of whether or not Wilkinson's rights were infringed comes in a post-*Sacramento* qualified immunity context. That is, we are all in agreement that, whether or not a constitutional violation occurred, the defendants are still entitled to qualified immunity because the law in this area was not clearly established at the time the SRS investigation took place. In one sense, therefore, it does not matter whether the majority or I read the facts correctly, since the entire discussion of the scope of Wilkinson's parental right is, necessarily, dicta.

Indeed, *all* statements about constitutional rights made in the *Sacramento* framework (i.e., where qualified immunity exists notwithstanding the violation of a right since the right was not clearly established at the time the conduct allegedly occurred) are dicta, *see Horne v. Coughlin*, 178 F.3d 603, 604 (2d Cir.1999) (petition for rehearing), and hence provisional only. The significance of such *Sacramento* state-

ments must rest, therefore, not in ultimately determining what are or are not constitutional rights, for as *Horne* also pointed out, rights can only be established through holdings. *See id.* The importance of defining rights provisionally in a *Sacramento* context lies elsewhere. Its function is to place government officials on notice that they ignore such "probable" rights at their peril. The Supreme Court, moreover, said as much when it told the lower courts to issue dicta declaring that certain conduct violates a fundamental right *in order* to "promote[ ] clarity in the legal standards for official conduct." *Wilson*, 119 S.Ct. at 1697. Footnote Five of *Sacramento*, as expounded in *Wilson*, stands for the proposition that lucid and unambiguous dicta concerning the existence of a constitutional right can without more make that right "clearly established" for purposes of a qualified immunity analysis.[3]

As the High Court has told us, the thrust of *Sacramento* is to keep the existence of qualified immunity from preventing the clarification of constitutional rights. By providing that the first statement about a given right will usually be in dicta that is explicit enough to put state actors on notice,[4] *Sacramento* creates a situation in which the next time that particular right is alleged, qualified immunity will not be a defense. On that occasion, the court will therefore face the ultimate questions about the existence and scope of the right that is being contested. The court may then decide to back down from the prior dicta about the right, or it may instead establish that right by turning the prior dicta into a holding. Either way, however, by permit-

**3.** In this respect, it is worth emphasizing that the Supreme Court has never stated that the point of *Sacramento* is actually to create rights. The court has instead carefully adhered to language that justifies the *Sacramento* inquiry as a way of clarifying standards of official conduct. *See Sacramento*, 523 U.S. at —— n. 5, 118 S.Ct. at 1714 n. 5.

**4.** Of course, there are some situations in which the first statement about a right will be a holding. For example, the defense of quali-

fied immunity might be waived, which would allow a court to focus exclusively on the existence of the contested right. Another possibility is that there could be enough clear statements about a right in dicta from other cases so that a court could declare that the right had been clearly established even without any holdings to that effect. *See Wilson*, 119 S.Ct. at 1702 (Stevens, J., concurring in part and dissenting in part).

 

ting a subsequent court (and often a second panel of the same court of appeals) to take up a constitutional right in the absence of a qualified immunity defense, *Sacramento* increases the probability that the courts of appeals will receive full briefings and arguments before making final decisions on important constitutional issues. *Cf. Horne,* 178 F.3d at 604–07. (expressing the concern that deciding such constitutional issues in cases where the result would not be altered was dangerous). It goes without saying that dicta from a prior panel concerning a constitutional right deserves respect. It certainly ranks with holdings from other circuits. Nevertheless, it is not binding, and therein lies its unusual significance in the constitutional scheme.

### III

The majority today finds no violation of a constitutional right. And yet in doing so it draws a line beyond which it means for state actors to operate at their peril. That line is, of course, asserted in dicta. But, in a *Sacramento* context, it is dicta that cannot casually be ignored.

The charge of "child abuse" is one of the most potent and destructive that our society can level against a parent. Once made, its effects cannot be undone. Even if disproved, a deep scar remains. We cannot permit agents of the state to credit such accusations lightly. Nevertheless, even though in my view SRS's conduct was—on facts that could be found by a jury—unreasonable, the unreasonableness of that behavior was not clearly established when Thomas Wilkinson was "abused" by the social workers investigating him. Qualified immunity therefore applies—as it must—to protect these social workers from liability. They did not have adequate previous guidance from the courts, and it is both unfair and on our precedents not permitted, given that uncertainty, to make them pay for Wilkin-

son's undoubted injury. For this reason, I concur in the court's judgment.